AO 91 (Rev. 11/82)                                **CRIMINAL COMPLAINT**                        COPY

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br>GREGORY ALLEN JUSTICE | DOCKET NO.<br>**16 - 1357M** |
|---|---|
| | MAGISTRATE'S CASE NO.<br>FILED<br>CLERK, U.S. DISTRICT COURT<br>JUL - 1 2016<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY |

Complaint for violation of Title 18, United States Code, Sections 1831 (Economic Espionage); Title 22, United States Code, Section 2778(c) (the Arms Export Control Act), and Title 22, Code of Federal Regulations, Section 127.1 (the International Traffic in Arms Regulations)

| NAME OF MAGISTRATE JUDGE<br>HONORABLE ALICIA G. ROSENBERG | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>March 4, 2016 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

**[18 U.S.C. § 1831(a)(4); 22 U.S.C. § 2778(c) and 22 C.F.R. § 127.1]**

On March 4, 2016, GREGORY ALLEN JUSTICE provided materials to a person that JUSTICE believed was an agent of the Russian government, when in fact that person was an under-cover employee of the Federal Bureau of Investigation.  The materials that JUSTICE provided were trade secrets and contained technical data that required an export license to be exported from the United States pursuant to the International Traffic in Arms Regulations.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>Peter D. Lee          /S/ |
|---|---|
| | OFFICIAL TITLE<br>Special Agent – Federal Bureau of Investigation |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE[(1)]<br>ALICIA G. ROSENBERG | DATE<br>July 1, 2016 |
|---|---|

[(1)] See Federal Rules of Criminal Procedure 3 and 54

AUSAs A. Lewis / M. Mills x1786/0627      REC: Detention      AGL

# A F F I D A V I T

I, Peter Lee, being duly sworn, hereby declare and state as follows:

## I.    INTRODUCTION

1.    I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since 2014.  I am empowered by law to conduct investigations and make arrests for offenses enumerated in Title 18, United States Code, Sections 1951(a) and 2113.  During my employment as an SA, I completed 21 weeks of training at the FBI Academy in Quantico, Virginia, where I received formal training in investigative techniques.  Additionally, I have received formal training in counterintelligence investigations and criminal investigations.

2.    While employed as an SA in the FBI Los Angeles Division, I have been assigned to investigate national security matters and criminal matters.  I have conducted, or been involved in investigations which employ, various investigative techniques to include court-ordered authorized interceptions of wire and oral communications, pen register and trap and trace devices, telephone toll analysis, physical surveillance, confidential sourcing, cooperating witnesses, undercover operations, Grand Jury proceedings, and search warrants.  Through my training, experience, and interaction with other law enforcement officers, I am familiar with the methods employed by those engaged in espionage crimes.

- 1 -

3.    I am submitting this affidavit in support of a criminal complaint and arrest warrant for GREGORY ALLEN JUSTICE ("JUSTICE") for violations of Title 18, United States Code, Sections 1831 (Economic Espionage); and Title 22, United States Code, Section 2778(c) (the Arms Export Control Act, or "AECA"); Title 22, Code of Federal Regulations, Parts 120-130 (the International Traffic in Arms Regulations, or "ITAR") (collectively, the "SUBJECT OFFENSES"). As set forth herein, there is probable cause to believe that JUSTICE provided technical data that he knew was both proprietary and controlled for export from the United States because of its military nature to a person he believed to be an agent of a Russian intelligence service.

4.    The facts set forth in this affidavit are based on: (1) my personal involvement in this investigation; (2) my review of reports and other documents related to this investigation; (3) my training and experience; and (4) information obtained from other law enforcement officers and witnesses.

5.    This affidavit is intended to show that there is sufficient probable cause to believe that JUSTICE has committed the SUBJECT OFFENSES and does not purport to set forth all of my knowledge of, or the full extent of the government's investigation into, the matters described herein. I have set forth only those facts and circumstances that I believe are necessary to establish probable cause for the complaint and the arrest warrant. Unless specifically indicated otherwise, all conversations, statements, and other information described in

- 2 -

this affidavit are related in substance and in part only.
Further, all dates noted in this affidavit are on or about the
date listed.

## II.   LEGAL BACKGROUND

### A.   Arms Export Control Act

6.    The Arms Export Control Act authorizes the President
of the United States, among other things, to control and enforce
the export of defense articles, defense services and related
technical data.  22 U.S.C. § 2778.  It is a criminal violation
for anyone to willfully violate any provision of 22 U.S.C.
§ 2778 or any rule or regulation issued under the authority of
that section.  22 U.S.C. § 2778(c).

7.    The regulations that are promulgated under that
authority comprise the ITAR.  The list of defense articles,
defense services, and technical data is contained in the United
States Munitions List ("USML"), which is codified in Title 22,
Code of Federal Regulations, Section 121.1.  In order to export
any defense article or technical data that is on the USML--
regardless of its value--a valid export license must be obtained
from the Department of State, Directorate of Defense Trade
Controls ("DDTC").  22 U.S.C. § 2778(b)(2); 22 C.F.R.
§ 123.1(a), § 127.1(a).

8.    Title 22, Code of Federal Regulations, Section 127.1[1]
provides in relevant part as follows:

---

[1]    Section 127.1(a) and (e) of the ITAR was revised effective
October 25, 2013, 78 Fed. Reg. 52680 (Aug. 26, 2013).

- 3 -

(a) Without first obtaining the required license or other written approval from the Directorate of Defense Trade Controls, it is unlawful:

> (1) To export or attempt to export from the United States any defense article or technical data . . . for which a license or written approval is required by this subchapter;
> . . .
> (4) To conspire to export, import, reexport, retransfer, furnish or cause to be exported, imported, reexported, retransferred or furnished, any defense article, technical data, or defense service for which a license or written approval is required by this subchapter; or
>
> (5) To possess or attempt to possess any defense article with intent to export or transfer such defense article in violation of 22 U.S.C. 2778 and 2779, or any regulation, license, approval, or order issued thereunder.
> . . .
> (e) No person may knowingly or willfully attempt, solicit, cause, or aid, abet, counsel, demand, induce, procure, or permit the commission of any act prohibited by, or the omission of any act required by 22 U.S.C. 2778, 22 U.S.C. 2779, or any regulation, license, approval, or order issued thereunder.

9.  An "export" means "[s]ending or taking a defense article out of the United States in any manner, except by mere travel outside of the United States by a person whose personal knowledge includes technical data," and it also means "[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad." 22 C.F.R. § 120.17. A "defense article" is defined to include "any item or technical data designated in § 121.1," i.e., the USML.

- 4 -

10.   The term "defense article" is defined to mean "any item or technical data designated in § 121.1 of this subchapter. . . . This term includes technical data recorded or stored in any physical form, models, mockups or other items that reveal technical data directly relating to items designated in § 121.1 [the USML] of this subchapter." 22 C.F.R. § 120.6.   The definition of the term "technical data" includes "information . . . which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles.   This includes information in the form of blueprints, drawings, photographs, plans, instructions or documentation." 22 C.F.R. § 120.10(a).

**B.   Economic Espionage**

11.   Title 18, United States Code, Section 1831, provides in relevant part:

> (a) In General.--Whoever, intending or knowing that the offense will benefit any foreign government, foreign instrumentality, or foreign agent, knowingly--
>
> (1) steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains a trade secret;
>
> (2) without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys a trade secret;
>
> (3) receives, buys, or possesses a trade secret, knowing the same to have been stolen or

- 5 -

appropriated, obtained, or converted without authorization;

(4) attempts to commit any offense described in any of paragraphs (1) through (3); or

(5) conspires with one or more other persons to commit any offense described in any of paragraphs (1) through (3), and one or more of such persons do any act to effect the object of the conspiracy,

shall, except as provided in subsection (b), be fined not more than $5,000,000 or imprisoned not more than 15 years, or both.

12.   The following terms are defined in Title 18, United States Code, Section 1839, as follows:

(1) The term "foreign instrumentality" means any agency, bureau, ministry, component, institution, association, or any legal, commercial, or business organization, corporation, firm, or entity that is substantially owned, controlled, sponsored, commanded, managed, or dominated by a foreign government;

(2) the term "foreign agent" means any officer, employee, proxy, servant, delegate, or representative of a foreign government;

(3) the term "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—

(A) the owner thereof has taken reasonable measures to keep such information secret; and

(B) the information derives independent economic value, actual or potential, from not

being generally known to, and not being readily
ascertainable through proper means by, the
public.

### III.  STATEMENT OF PROBABLE CAUSE

**A.    Summary**

13.   JUSTICE has worked for a cleared defense contractor
("Cleared Contractor A") in the Central District of California
from 2000 through present, where he has worked on commercial and
military satellites.  Beginning in February 2016, JUSTICE began
meeting with a person whom he believed to be a representative of
a Russian intelligence service, but who was in fact an FBI
under-cover employee ("UCE").  During those meetings, JUSTICE
offered and subsequently provided to the UCE digital copies of
documents that were both proprietary to Cleared Contractor A and
controlled for export from the United States or to foreign
persons under the ITAR.  The UCE paid JUSTICE $500.00 or
$1,000.00 at four of those meetings when JUSTICE provided
materials related to Cleared Contractor A's satellites.

**B.    Background on JUSTICE**

*JUSTICE's Employment at Cleared Contractor A*

14.   I reviewed materials provided by Cleared Contractor A
that show JUSTICE began working at Cleared Contractor A, located
in the county of Los Angeles, California, in 2000.  Based on
information provided by Cleared Contractor A, JUSTICE was not
granted access to classified data during the course of his
employment.

15.   From my review of a report prepared by Cleared Contractor A dated December 16, 2015, from my review of JUSTICE's personnel file, from my review of other records provided by Cleared Contractor A, and from other FBI SAs' discussions with Cleared Contractor A's security employees, I learned the following:

    a.   JUSTICE has been employed at Cleared Contractor A, under its satellite systems program, since March 2000.  This program builds and conducts operational security testing for satellite systems.

    b.   JUSTICE had been assigned to a team working to build and test U.S. military satellites, including projects for the United States Air Force, United States Navy, and National Aeronautics and Space Administration.

    c.   JUSTICE's current position at Cleared Contractor A, Production Engineer, is situated in Cleared Contractor A's Defense Group.

    d.   Since 2004, JUSTICE has worked on matters including: Wideband Global Satellite Communications ("WGS") system,[2] Global Positioning System ("GPS"), Geostationary Operational Environmental Satellites ("GOES"), Tracking and Data Relay Satellite ("TDRS"), and Milstar Communication Satellite ("MILSTAR").  In 2012, JUSTICE was assigned to support the TDRS program as lead deployment engineer.  In 2013, JUSTICE supported multiple programs, to include Inmarsat, Mexsat, and GPS IIF.

_____

[2] The WGS system is also known as "Wideband Gapfiller Satellite Communications."

- 8 -

e.    I have reviewed open-source, publicly available information that described the projects identified in this report, and learned the following:

i.    The WGS system is described as providing "broadband communications connectivity for U.S. and allied warfighters around the world. . . . WGS is the highest-capacity military communications system in the U.S. Department of Defense arsenal, providing a quantum leap in communications capability for the U.S. military."

ii.    GOES satellites are "advanced multimission weather and earth-observation satellites for the National Oceanic and Atmospheric Administration and NASA."

iii.    GPS IIF "is an upgrade of the current GPS, which is a worldwide timing and navigation system made up of 24 satellites orbiting some 12,000 miles above earth."

iv.    TDRS are "communication satellites" utilized by NASA.

v.    MILSTAR is a military satellite program that is principally used for "anti-jam capabilities [that] provide low probability of interception and detection," and "low data rates compared with later generations."

f.    Additionally, according to an e-mail sent to JUSTICE by a Cleared Contractor A employee, JUSTICE was administratively debriefed from the TDRS program on November 24, 2015 and was asked to return his access badge for the program.

g.    JUSTICE currently works the third shift, which generally begins at 10 p.m. and ends at 6 a.m. (Pacific Time).

- 9 -

16.   Based on a review of JUSTICE's training records at Cleared Contractor A, JUSTICE completed numerous information security courses, including but not limited to the following web-based training courses:

     a.    Information Security 2015 (July 10, 2015);

     b.    Intellectual Property for Engineers and Technologists (July 10, 2015);

     c.    Threat Management Training for Employees (July 10, 2015);

     d.    Trade Secrets and Proprietary Information (July 9, 2015);

     e.    Enterprise U.S. Export Awareness Overview (July 9, 2015);

     f.    Information Security 2014 (June 25, 2014);

     g.    2014 Ethics Recommitment Training (May 6, 2014); and

     h.    Enterprise U.S. Export Awareness Overview (November 27, 2013).

17.   Employment applications submitted by JUSTICE dated and signed January 27, 2000 and February 2, 2000 state JUSTICE received a "B.S." in June 1998 from California State Polytechnic University ("Cal Poly") in Pomona, California.  A 2012 resume submitted by JUSTICE to Cleared Contractor A also notes his education in mechanical engineering from Cal Poly in Pomona, California.

18.   On an SF-85 certified by JUSTICE dated February 17, 2011, however, JUSTICE stated:  "I completed my course of study

- 10 -

at Cal Poly, Pomona in June 1998 and participated in the commencement ceremony.  It wasn't until several years later (2002) that I learned that my degree had been denied because the grade for my Senior Project was never submitted, so the grade went to 'Incomplete' and then to 'F.'"

19.  In November 2015, monitoring of JUSTICE's computer by Cleared Contractor A showed that he had inserted a USB device into his computer that contained five specific folders.  A screenshot of JUSTICE's computer provided by Cleared Contractor A reflected the metadata for those files, which showed that their last-modified dates were on July 18, 2015, July 20, 2015, and July 27, 2015.  The screenshot of JUSTICE's computer only showed that JUSTICE had inserted the USB device that contained those folders; it did not show the contents of the folders.

20.  According to materials provided by Cleared Contractor A and discussions other FBI SAs have had with Cleared Contractor A employees, those folder names correspond to folders on Cleared Contractor A's computer network related to the model satellite bearing the same name that appeared in the folder titles.  The folders contain detailed mechanical drawings and design information.  I reviewed additional correspondence with a Cleared Contractor A employee who stated that this particular model satellite is related to the GPS IIF program.

21.  In April 2016, the Bureau of Industry and Security's Office of Exporter Services, Export Management and Compliance Division, completed a licensing history check on JUSTICE and

- 11 -

certified that no license history per the U.S. Commerce
Department's export license management record system was found.

22.    In May 2016, the Bureau of Political-Military Affairs,
Office of Defense Trade Controls/Policy completed first level
review of files submitted in paragraph 77.  The results of the
first level reviews are detailed in paragraph 79.  A U.S. State
Department license pursuant to the ITAR is required for export
or temporary import.

23.    According to discussions other FBI SAs have had with a
Cleared Contractor A employee, the following is required by
JUSTICE from the time of his arrival at work until he can access
and download Cleared Contractor A proprietary information as
described in paragraphs 19, 44.d, 52.e, 61.d, and 73.c below:

    a.    Show badge to a guard at the entrance to Building
S01, or enter through a badge-controlled gate when no guard is
on duty.  Persons without a Cleared Contractor A badge are not
admitted onto the property.  JUSTICE's work area also requires a
badge swipe at the door.

    b.    When logging onto his work station, insert badge
and provide a PIN in order to access the Cleared Contractor A
network.

    c.    When accessing a certain database[3], the PIN must
be re-entered.

---

[3]    Cleared Contractor A utilizes this database to provide for
collaboration and storage for a work group.  The owner of a
particular database site controls access through the use of an
access control list.  The owner must approve each request for
access.  The system will indicate if the requestor is a U.S.
Person.  The owner must also validate all users on an annual

d. Once logged onto the database, document tiles and their controls are displayed in a table format; this table shows if documents are Cleared Contractor A Proprietary and indicates that such documents must be handled using enhanced controls. The table also indicates if documents are export-restricted. This information is also included on the documents themselves.

e. The Cleared Contractor A employee stated that JUSTICE participates in annual training regarding information protection and handling export-controlled materials, as indicated in paragraph 16.

**JUSTICE's Financial Transactions**

24. I learned from my review of Cleared Contractor A's monitoring of JUSTICE's computer use and from physical surveillance that JUSTICE's wife appears to have medical issues and is, for the most part, house-bound. My review of bank account transactions from 2013 through 2015 showed medical expenses totaling $5,873.00, to include payments made for physician and hospital visits, purchases at pharmacies, and purchases of health supplements and medical equipment. According to a recording made by the FBI pursuant to a court order, on March 15, 2016, JUSTICE had a telephone conversation with his wife in which he stated that his wife should cancel all of her upcoming medical appointments for the foreseeable future because they would not be able to come up with the money to

basis. Approved users must access the database through the site's login portal. Non-approved users will not be given access; they can submit a request, but the site owner must explicitly approve the request.

repair their car in order to bring her to the medical appointments, including going to the "pain center."

25.   Bank records show that JUSTICE has withdrawn cash and used the proceeds of those cash withdrawals to send packages containing cash via Fed Ex to a person he appears to know as "Chay," but who is in fact has a name with the initials C.M., which is the name of the person who resides at the address to which JUSTICE sends those packages.

a.   According to information stored on JUSTICE's work desktop computer that was obtained by Cleared Contractor A, JUSTICE had saved at least nine photographs in .jpg format that incorporated the word "Chay" in the title; the photographs were of a female.

b.   A reverse-image search conducted on Google identified the female in the photographs as a Europe-based model with the initials J.G.

c.   As described below in paragraph 29, based on my review of records provided by Fed Ex and on court-authorized inspection of some of the packages that JUSTICE sent via Fed Ex to an apartment in Long Beach, California, JUSTICE addressed those packages to "Chay [M.]"

d.   California Department of Motor Vehicles ("DMV") records show that a person with C.M.'s name resides at the Long Beach, California, apartment to which JUSTICE addressed the packages.  Furthermore, a Facebook account in C.M.'s name indicates that she resides with her boyfriend and their son. The photographs of the person in that DMV record and on that

- 14 -

Facebook page match, but do not match the photographs saved on
JUSTICE's Cleared Contractor A computer titled "Chay."

     e.  Based on that, I believe that the person who
JUSTICE knows as "Chay" is not the person (the model) depicted
in the photographs that he refers to as "Chay," but rather is a
different woman who lives with her boyfriend and son and who
requests continual cash payments and gifts from JUSTICE, as
described in further detail below.

    26.  The following are two such examples of JUSTICE's
payments to "Chay," referenced herein by the initials C.M.

     a.  On February 1, 2016, JUSTICE sent C.M. $975.00.

      i.  I have reviewed a bank record showing that
on January 29, 2016, JUSTICE withdrew $50.00 in cash from his
Kinecta Federal Credit Union Savings Account ending in 7207.

      ii.  I have reviewed ATM surveillance video
footage from that withdrawal. Based on my comparison of that
footage to JUSTICE's California DMV photograph and my own
personal observation of JUSTICE while conducting physical
surveillance, I believe the ATM surveillance video showed
JUSTICE making the withdrawal.

      iii.  I have reviewed court-authorized
surveillance of telephone and text-messaging records between
JUSTICE and C.M., wherein C.M. text-messaged JUSTICE on February
1, 2016, beginning at 6:29 a.m. (Pacific Time) asking, "Hey so
how much this week no when?" JUSTICE answered, "You should get
it tomorrow. There was 995, the bank took out $5 for 'account

maintenance' fee and I needed 20 to send it so only 975 this
week. Add the $25 to what I owe you lo."

      iv.    I have reviewed photographs taken during a
court-authorized inspection of a package mailed at Fed Ex on
February 1, 2016, from "Ajay" at Auto Service Business A in
Culver City, California, to C.M., which contained 48 U.S.
currency bills in $20 denomination and three U.S. currency bills
in $5 denomination, totaling $975.00.

      b.    On March 10, 2016, JUSTICE sent C.M. $1,000.00.

      i.    I have reviewed court-authorized
surveillance of telephone and text-messaging records between
JUSTICE and C.M., wherein JUSTICE text-messaged C.M. on March
10, 2016 beginning at 9:03 a.m. (Pacific Time) stating: "Today
I sent you the 1000 I could get out of the ATM. Tomorrow I'll
send another 250." Beginning at 9:16 a.m., C.M. replied: "I
thought u said u would have $50 or $60 extra ?...I told u not to
send it but yesterday I said please send whatever extra u can."
At 9:22 a.m., JUSTICE replied: "Yes but remember I can only get
500 every 24 hours out of the ATM so if I got 60 yesterday I
could still only get 440 this morning."

      ii.    I have reviewed physical surveillance
records that place JUSTICE at Fed Ex on March 10, 2016 at
approximately 6:19 a.m. mailing a pre-addressed manila envelope.

      iii.    I have reviewed photographs taken during a
court-authorized inspection of a package mailed to C.M. via Fed
Ex on March 10, 2016, from "Ajay" at Auto Service Business A,

which contained 50 U.S. currency bills in $20 denomination, totaling $1,000.00.

27.   A review of Kinecta Federal Credit Union account records ending in 7207 from 2015 through 2016 noted that JUSTICE withdrew a total of $64,686.00 from his retirement plan at Cleared Contractor A, to include three incoming transfers on January 15, 2015 for $33,239.00, March 13, 2015 for $26,818.00, and October 29, 2015 for $4,629.00.   A total of $51,835.00 was withdrawn from JUSTICE's Kinecta Federal Credit Union account ending in 7207 between approximately January 1, 2015 and February 29, 2016.

28.   In addition to these cash withdrawals from JUSTICE's Kinecta Federal Credit Union account ending in 7207, I have also reviewed Kinecta Federal Credit Union account records ending in 7201 as well as Provident Credit Union account records ending in 9090 that show a total of 206 cash withdrawals totaling $96,795.00 from ATMs and at the branches of the credit unions between approximately January 1, 2015 and February 29, 2016 (which sums include the $51,835.00 described in the previous paragraph.)   I have also reviewed physical surveillance records showing that on numerous occasions JUSTICE drove from Cleared Contractor A to Fed Ex.

29.   A substantial portion of JUSTICE's cash withdrawals from his credit union accounts (one of which received the funds that JUSTICE transferred out of his retirement account) have been sent via Fed Ex to C.M.   Specifically, I have reviewed physical surveillance records, receipts and records obtained

- 17 -

from Fed Ex, and the results of court-authorized inspection of packages that JUSTICE sent through Fed Ex that show JUSTICE had sent envelopes containing money to C.M. on multiple occasions, including the following dates and cash amounts discovered totaling 22 times for $21,420.00:

       a.    December 10, 2015 for $1,440.00;

       b.    December 22, 2015 for $1,000.00;

       c.    January 7, 2016 for $1,100.00;

       d.    January 14, 2016 for $600.00;

       e.    January 15, 2016 for $700.00;

       f.    January 19, 2016 for $1,000.00;

       g.    January 28, 2016 for $480.00;

       h.    February 1, 2016 for $975.00;

       i.    February 11, 2016 for $980.00;

       j.    February 12, 2016 for $400.00;

       k.    February 18, 2016 for $1,080.00;

       l.    February 25, 2016 for $1,000.00;

       m.    February 26, 2016 for $700.00;

       n.    March 3, 2016 for $1,400.00;

       o.    March 10, 2016 for $1,000.00;

       p.    March 16, 2016 for $1,300.00;

       q.    March 24, 2016 for $500.00;

       r.    March 25, 2016 for $720.00;

       s.    March 30, 2016 for $1,400.00;

       t.    April 7, 2016 for $1,400.00;

       u.    April 13, 2016 for $1,100.00;

       v.    April 22, 2016 for $1,145.00;

     w.   May 5, 2016 for $980.00; and

     x.   May 6, 2016 for $370.00.

30. As described in further detail below in paragraphs 49, 59, and 65, JUSTICE also sent at least $1,700.00 of the $2,500.00 he received from the UCE to C.M. via Fed Ex, which are included in the list above as $500.00 of the shipment of $700.00 on February 26, 2016, $200.00 of the shipment of $1,300.00 on March 16, 2016, and $1,000.00 of the shipment of $1,100.00 on April 13, 2016. (In other words, those $1,700.00 were not the proceeds of JUSTICE's withdrawals from JUSTICE's credit union accounts, rather they were payments from the UCE.)

31. In addition to these cash payments, JUSTICE also sent C.M. gifts. I have reviewed JUSTICE's purchase records from on-line retailer Amazon.com showing JUSTICE purchased and shipped numerous goods and items to C.M., including: a Kingsford charcoal grill on April 6, 2015 for $173.31; Essential Home kitchen furniture on March 14, 2015 for $307.99; Dyson fan on February 10, 2015 for $295.99; and a Vizio television on January 22, 2015 for $449.89. Furthermore, I have reviewed court-authorized surveillance of telephone and text-messaging records wherein JUSTICE agreed to purchase and ship numerous goods and items to C.M., including: a purse on January 14, 2016 for $65.00; a blanket on January 6, 2016 for $48.49; and another television on December 18, 2015 for $267.62. JUSTICE also provided cash to C.M. on February 26, 2016 to purchase an Apple iPhone model 6S for approximately $900.00.

32. A review of Amazon.com retail orders from 2015 through 2016 noted that JUSTICE placed and paid for 86 orders for C.M. totaling $5,916.09, which included tax and shipping fees, between January 11, 2015, and January 14, 2016.

33. In a court-authorized audio recording of JUSTICE in his vehicle on February 17, 2016, JUSTICE stated "[y]our breakfast is already, what, twenty-five times more expensive than mine. You still think you deserve more and I deserve less. It bothers me. It offends me. That for all these years, I have put everything into providing for you. No matter how much I sacrifice, no matter how much I do, or how, you still can't, because you don't care." Based on the fact that JUSTICE often brings his wife breakfast, it appears that JUSTICE was referring to his wife in this conversation, even though, according to surveillance personnel observing him at the time, he appeared to be alone in the car.

34. A review of JUSTICE's bank account transactions from 2013 through 2015 has noted that JUSTICE purchased approximately $4,344.00 in online courses, including courses in "Spy Escape and Evasion," "Delta Defense LLC," "Legally Concealed," "Fight Fast," and "Survival Publications."

35. On January 13, 2016, a court-authorized search of JUSTICE's vehicle revealed a handwritten note that included the following address:

> 2650 Wisconsin Avenue
> WDC 20007        (202) 965-1181
> 2552 Belmont Road NW
> 20008

- 20 -

36.  A review of public information revealed the 2650 Wisconsin Avenue address is associated with the Embassy of The Russian Federation, and the 2552 Belmont Road address is associated with the Office of the Defense, Military, Air and Naval Attaches of the Embassy of The Russian Federation.  Both are located in Washington D.C.

37.  During that same search of JUSTICE's vehicle, another handwritten note was found that stated the following:

> 2790 Green St.
> SF
> (415) 928-6878
>       202-9800

38.  A review of public information revealed that the "2790 Green St. SF" address is associated to the Consulate General of Russia located in San Francisco, California.

## C.  Meetings with the Under-Cover Employee

39.  Between February 12, 2016, and May 13, 2016, JUSTICE spoke with the FBI UCE over the telephone on multiple occasions and met with the UCE in-person on five occasions.  I have reviewed audio recordings of the telephone calls between JUSTICE and the UCE, physical surveillance records, and audio and video recordings of the meetings between JUSTICE and the UCE, and describe those telephone calls and meetings below.

### *First Meeting with UCE on February 17, 2016*

40.  The first in-person meeting occurred in Los Angeles County on February 17, 2016.  Previously on February 10, 2016, a court-authorized audio surveillance recording that I have listened to from JUSTICE's car shows that JUSTICE placed a

telephone call and asked to speak to a "naval attaché," said he
was a "private citizen," and said that, "last autumn I sent a
technical schematic and I called to follow up on that and spoke
with the Naval Attaché for a moment and I was just calling to
follow up to see if he was still interested in, in uh,
maintaining contact and uh obtaining more of the uh, similar
things to what I sent. Okay, I will try to call later."

41. After the UCE left a voicemail for JUSTICE on February
12, 2016, JUSTICE called the UCE back on February 13, 2016. In
that telephone call, JUSTICE said that he had called a certain
"Captain" in September, and had "told him my situation my wife
is disabled and is very ill. So if I'm not at work, most of my
time is taking care of her." At the end of that call, JUSTICE
and the UCE planned to speak again. On February 15, 2016,
JUSTICE and the UCE spoke again, and in that telephone call they
set a time and place to meet. JUSTICE and the UCE each
described their physical appearances and what they would be
wearing at the meeting. The UCE asked JUSTICE if JUSTICE had
told anyone about their conversation, and JUSTICE said "[o]h of
course not. No, no, no."

42. On February 17, 2016, JUSTICE met the UCE at the
coffee shop. During the meeting, the following was said:

a. The UCE said "you're very, very important to the
Russians. I know you said you want a relationship, yes, and I
was curious in what you want, expect." JUSTICE said that his
"wife is in very ill health," that "it's a whole list of
problems, and um, medical care is very expensive so um, my hope

- 22 -

for initiating this relationship is that we can both benefit.
You can get something that will maybe help you, and I can get
something that will help me."  The UCE asked:  "Is there
anything in mind particular or," and JUSTICE said "right now I
just need money."  The UCE said "we could probably come to
agreement and do this," and to "make a friendship."

      b.    JUSTICE said he worked at Cleared Contractor A.
The UCE asked what it was that JUSTICE wanted to provide, and
JUSTICE explained:

> Um, okay so uh, since the 1980s the United States
> Air Force has been building and launching
> surveillance satellites called WGS.  And um,
> these are the same things on your phone for the
> maps.  Things like that.  They're also for,
> they're also worldwide surveillance.  So we build
> those.  So what I'm offering is basically
> everything on our servers, on our computers.  The
> plans, the test procedures, that's what I have
> access to.

      c.    JUSTICE said he had previously sent a schematic,
and that "[t]here are hundreds."  JUSTICE said he has "access to
everything for this program that's on our servers."  JUSTICE
said he had not brought any examples to the meeting.

      d.    JUSTICE explained that he worked on "NASA's TDRS
Program which is data relay," that "US Navy has a program called
WHF," and "Air Force's program called WGS, which we've been
building that since 2002 and several of those um, if you're
interested in those schematics."  JUSTICE further explained that
TDRS "was originally launched to communicate between . . . the
space shuttle and the ground stations," and that "WGS, the big

Air Force program, that's frontline communication for, for,
servicemen." JUSTICE explained that he had access to commercial
and government or military information. He said he did not have
access to "above military," which was kept more securely, and
JUSTICE described the procedures by which it was secured.
JUSTICE said it was "probably not" possible to get access to
that information.

   e. The UCE asked JUSTICE how JUSTICE could deliver
information, and JUSTICE said "a little flash drive."

   f. The UCE asked what would be important, inquiring
if the "commercial information" could be found on the Internet.
JUSTICE replied: "You can find, you can find like an overview.
Okay this, this, this satellite was designed to do this, and it
operates in this frequency band, and it flies at this altitude.
That's about it. Even for commercial they're not gunna, because
it's, it's not classified, but its considered trade secrets so
none of that's gunna be available."

   g. JUSTICE then described the military information,
and said: "Everything is ITAR. Do you know ITAR?" The UCE
said he did.

   h. JUSTICE said that his name was not "Brian," but
that he had used it to preserve his anonymity "on the telephone,
and with the original paperwork that I sent." JUSTICE said that
"eventually" he might use his real name. JUSTICE said that "I
know it's not like real life but I like spy movies," and then
said his favorites were Jason Bourne and James Bond. JUSTICE
said he loved the show "The Americans." The UCE at one point

- 24 -

asked JUSTICE:  "You understand the security risk here."
JUSTICE said "very much," for "both of us."

     i.    JUSTICE explained that he had been working the
night shift for three years consistently, and intermittently for
twelve years.

     j.    JUSTICE explained that "[r]ight now my main
concern is trying to cover existing medical bills."  JUSTICE
later said "I'm so underwater with, with everything right now
that I don't even know how far."

     k.    The UCE and JUSTICE discussed their next meeting,
and the UCE said:  "what I will do is I will send it back to
Moscow and they will review this and they will determine what
they think it's worth but if you have something in mind, an idea
that I can, because it all depends on how much and what level
and how important."  JUSTICE then elaborated:

> [T]here are three types of files.  There is,
> there, the first one that I sent is, it has what
> we call white hardware.  It actually is in space.
> Um the second type of schematic is for tooling,
> so for support stand, or offload, or something
> that we use, but it stays on the ground.  The
> third file type is procedural.  It's written and
> is an assembly spec, or a test procedure, or
> something like that.  I'll try to bring a sample
> of each, of those and I'll try to get a count of
> how many there are and see if we can go from
> there.

     l.    JUSTICE said he was "nervous."  JUSTICE said, "I
can give you access to everything over time.  Everything on the
commercial server."  JUSTICE explained that "[e]verything
military is on the commercial servers."

*Second Meeting with UCE on February 19, 2016*

43.     JUSTICE and the UCE arranged a meeting time and place by telephone during a consensual monitoring on February 18, 2016, and decided to meet on February 19, 2016; I have reviewed the audio recording of that telephone call.

44.     As noted above, JUSTICE works an overnight shift.  I have reviewed screenshots of Cleared Contractor A's monitoring of JUSTICE's work computer, and they show that early in the morning on February 19, 2016, JUSTICE downloaded multiple files from Cleared Contractor A's computer systems.

        a.     For example, at 1:37 a.m., JUSTICE opened a folder titled "Temp."  Displayed in that folder on JUSTICE's screen were multiple files and folders, including folders with the same names and last-modified dates as those described above in paragraph 19 that were on the USB device that JUSTICE connected to his work computer in November 2015.

        b.     At 3:28 a.m., JUSTICE's screen displayed a list of files he was accessing.  In one such screen, 21 files were displayed in a table.  In the column labeled "Proprietary," all were "[Cleared Contractor A] Enhanced (Proprietary)."  In the column labeled "Export Control," all indicated "ITAR."  This table displayed the title of the document and the type of document.

        c.     At 3:59 a.m., JUSTICE's work computer displayed a warning that he had inserted an unprotected medium into the computer, and asked if JUSTICE wanted to encrypt the device.

d.   At 4:00 a.m., JUSTICE's computer screen showed he had inserted a removable disk, and it displayed a status window that stated "Copying 46 items (148 MB)." Three folders that appeared in the "Temp" folder; at that point in time, two of those folders appeared in the removable disk, which was also displayed.

45.   On February 19, 2016, JUSTICE met with the UCE at a location in Los Angeles County. The following occurred:

a.   JUSTICE explained he had "phoned the consulate," and then explained that he previously "printed, on paper, the schematic that I sent, and I mailed it. No return address. Um, and postage paid in cash. And I mailed to [a colonel] in Washington. And then a week later I called to speak to him to see if he had received it. He actually wasn't there, so I was given to [a captain]." JUSTICE said he could not go to Washington, DC because "I can't leave my wife there for three days. So finally her, her mother is coming to visit so I'm okay, good. This is a good time. So that's why I called again last week."[4]

b.   JUSTICE stated that he contacted the Russian Embassy through a phone purchased last year using cash, and that he "called the embassy again last week."

---

[4]   In a court-authorized audio recording of JUSTICE speaking in his vehicle, when apparently alone, JUSTICE said the UCE (referring to him by name) "just saved me six hundred." In other words, in this recording, JUSTICE may be saying in effect that because the UCE met JUSTICE in Los Angeles, the UCE saved JUSTICE the money that JUSTICE would have needed to spend to travel to Washington, DC.

c.    JUSTICE asked the UCE:  "Actually I was curious, and again if you're not allowed to answer this I understand, I was wondering if you are in the FSB?"  The UCE asked if JUSTICE knew the "difference between different services in Russia."  JUSTICE said "[a]ll I know is KGB more or less became the FSB."  The UCE explained that was "partly true," that "[t]he KGB split into different sections," "[k]ind of like in U.S. you have FBI, CIA and many other agencies."  The UCE explained that "[t]he SVR, that is kind of like your . . . CIA.  Overseas, abroad and similar to this.  So I am a department under this."  The UCE inquired:  "Did you watch the Americans," to which JUSTICE replied "I've seen the first, I'm current."  The UCE explained that "this department they work for . . . [t]hey do not go to embassy, they do not have, this is similar to what I do. . . . Probably simplest way to explain it."

d.    The UCE said "I know that you said you were little nervous; you're more comfortable tonight?"  JUSTICE said "I am much more comfortable tonight."

e.    The UCE noted that JUSTICE had said his wife was very ill, and that JUSTICE "had a large debt" and "medical bills," to which JUSTICE responded:

> Yes.  The main purpose.  Um, I was, I thought a lot about that, excuse me, and um, I think the best way to do this is not to set anything based on my needs because my wife is going to need medical care for the rest of her life, so that number will grow.  Even if I got enough to balance the scales today, tomorrow I'm back in debt.  So I think um, the best way is to let you

put your, let your superiors evaluate what I have and offer what you think is appropriate.

f.    JUSTICE then provided the UCE with a USB thumb drive and said it had "no encryption, no virus, no spyware, it's clean." JUSTICE said "the other night I told you there were three types of files," and explained:

> There's the flight hardware, the tooling and the written-- like the test and assembly specifications.  There are samples of all three there.  Five or six samples and uh, I told you also I would try to get you a count of how many there are.
> . . .
> Okay, so, all files that begin with [certain characters] and then numbers, those are your specification procedures.  There are 924.
> . . .
> Uh, files that begin [certain characters] and then six numbers, those are all your tooling schematics and there's 1,070. The ones that begin [certain characters] and then six numbers, that's all your flight hardware and I haven't had a chance to count those yet.

g.    JUSTICE explained "[t]his is military, this is all Air Force," and when the UCE asked if it was for planes, JUSTICE said "[n]o, I, I, I build satellites."  When asked what type, JUSTICE said "all types.  Anything that orbits the earth nonstop, we built."  When the UCE asked about JUSTICE's previous reference to GPS, JUSTICE said it was GPS, that "[t]his would be considered classified," and when asked what level, JUSTICE said, "[e]verything is ITAR.  I think this is below secret."

h.    When asked by the UCE if this was important information, JUSTICE said, "[u]m, well I don't know what would be important to you.  Um, this is, um, this is current. . . . Um

- 29 -

we built 12 satellites for this constellation and we just launched the last one two weeks ago.  So this, is flying and operating right now."  JUSTICE said it was not something that could be found on the Internet.  When the UCE asked about how Cleared Contractor A cooperates with Russia, and whether those people could have access to the same information, JUSTICE clarified that "[w]e built a few different satellites for Russia, for commercial use in Russia, um, and all over the world, but this is U.S. military, ah that's classified. . . . Um, they use, um they use this for GPS.  The commercial application is for your, your cell phones, for navigation.  Um, but the military uses this to track people.  This is for surveillance."

      i.  JUSTICE elaborated that "[t]here's another program that we're working on now called WGS," which JUSTICE explained was "Wideband Global SatCom.  It's a broad spectrum, it's a communications relay. . . . Uh, and this is to allow troops on the ground in foreign countries to communicate with each other, with headquarters, everything like that."  JUSTICE explained that "[t]his will be almost completely encrypted because there's no comm—there's no civilian application," but that JUSTICE did not have access to encryption information because "we don't operate this," "we just build."  JUSTICE explained that "[t]his is on the same server because it's military."

      j.  When discussing their next meeting, JUSTICE said he promised he would not tell anyone.

k.   Near the end of the meeting, the UCE gave JUSTICE $500.00, and signed a receipt for the cash.   JUSTICE also wrote down for the UCE the characters he referred to above, describing the contents and the count of files available as referenced above in paragraph 45.f: "[certain characters] – Specification and Procedure – 924"; "[certain characters] – Tooling Schematic – 1070"; "[certain characters] - Flight Hardware Schematic - ?," respectively.   JUSTICE also wrote down "GPS," and then "WGS (BBC)," followed by "Wideband Global Satcom," the long-form name of "WGS."

l.   JUSTICE explained his view that government is "there to protect you from outside aggressors and, and to settle internal disputes and that's it."

m.   JUSTICE said in parting "I'm grateful for the opportunity to work with you."

46.   I have reviewed the results of an examination by the FBI on February 22, 2016 of the thumb drive JUSTICE provided to the UCE on February 19, 2016.   According to that report, JUSTICE provided a 16-gigabyte SanDisk Ultra USB 3.0 digital storage device, and it contained 35 files, some of the documents having proprietary and/or export control warnings.

47.   Seventeen of the 35 files also appeared on the screenshots of JUSTICE's work computer in the early morning hours of February 19, 2016, as he was accessing and then transferring files off of Cleared Contractor A's computer systems.   (See paragraph 44.a above.   I learned from FBI SAs who have had discussions with a Cleared Contractor A employee that

- 31 -

the screenshots generally occur every six seconds, and therefore some activity by JUSTICE — and thus some of the files he accessed and copied — may not appear on the screenshots.) Based on my comparison of the names of the files, the 17 files observed by Cleared Contractor A's monitoring of JUSTICE's computer are the same as 17 of the files provided by JUSTICE to the UCE.

48.   A Cleared Contractor A employee reviewed the specific sample documents that JUSTICE provided to the UCE on February 19, 2016, and opined that there would be little value to a country with an established satellite program, although there were certain pieces of information that could assist in disrupting the function of the satellite technology that was the subject of the documents.   He believed the documents were ITAR-controlled all related to satellites still in use by the United States Air Force.

49.   After this meeting with the UCE, JUSTICE sent all $500.00 he received on February 19, 2016, from the UCE to C.M. via Fed Ex.   Specifically:

a.   I have reviewed physical surveillance records that show JUSTICE went to Fed Ex on February 26, 2016.

b.   I have reviewed a report of a court-authorized search of a shipment sent via Fed Ex on February 26, 2016 that was addressed to "Chay [M]."   Along with C.M.'s address, the package's address label listed the addressee's telephone number as (562) XXX-XXXX.   The sender's address listed on the package

JUSTICE sent was "Ajay" at Auto Service Business A, with a telephone number (310) XXX-4517.

     c.    The telephone number listed on the Fed Ex addressee information, (562) XXX-XXXX, is the same telephone number that JUSTICE used to communicate with "Chay" by telephone call and text message.

     d.    The contents of the envelope that JUSTICE sent via Fed Ex, which was a sealed manila envelope, were photographed and I have reviewed those photographs. One of the photographs showed ten fifty-dollar bills. The serial numbers of those fifty-dollar bills were the same as the serial numbers of the fifty-dollar bills that the UCE had given to JUSTICE on February 19, 2016, which were also photographed before they were given to JUSTICE by the UCE.

    50.   After the second meeting with the UCE, on February 22, 2016, a court-authorized audio recording from JUSTICE's vehicle captured JUSTICE saying: "I could go to prison, I could go to prison for this. I could go to prison for non-payment of taxes, even though I'm sovereign, they still want me to pay taxes."[5]

    51.   Another court-authorized audio recording from JUSTICE's vehicle captured JUSTICE saying on February 25, 2016: "I'm doing the work of people two levels above me, and it's not good enough for promotion. So, you know what, I give up. If, if I'm never going to get a promotion, then I'm just gonna, I'm

---

[5]    Based on Cleared Contractor A's monitoring of JUSTICE's work computer, I learned that JUSTICE has viewed material on sovereign citizens via the Internet, including how to become a sovereign citizen and how to manage being tax and debt free.

going to give up. I'm going to stop trying. Why put out the effort, if there's not going to be any reward? I'm tired and I'm done. He's like 'ohh no no no, you can't, you can't give up.' I mean, you're wrong. What I can't do is keep putting myself out, without, without, being rewarded for it. He said 'no, you're mistaken.' I can give up, it's actually very easy to give up. What I can't do is continue, is continue to provide this level of effort with no reward."

### Third Meeting with UCE on March 4, 2016

52. As noted above, JUSTICE works an overnight shift. I have reviewed screenshots of Cleared Contractor A's monitoring of JUSTICE's work computer, and they show that early in the morning and late in the evening on March 2, 2016, JUSTICE downloaded multiple files from Cleared Contractor A's computer systems.

a. For example, at 1:39 a.m., JUSTICE opened a folder titled "WGS." Displayed in that folder on JUSTICE's screen were multiple files. At 10:45 p.m., JUSTICE opened a folder titled "T." Displayed in that folder on JUSTICE's screen were multiple files.

b. At 1:42 a.m., JUSTICE opened the Recycle Bin folder and began permanently deleting files.

c. At 10:31 p.m., JUSTICE's screen displayed a list of files he was accessing. In one such screen, 19 files were displayed in a table. In the column labeled "Proprietary," all were "[Cleared Contractor A] Enhanced (Proprietary)." In the column labeled "Export Control," all indicated "ITAR." This

table displayed the title of the document and the type of document.

    d.    On March 3, 2016 at 6:05 a.m., JUSTICE's work computer displayed a warning that he had inserted an unprotected medium into the computer, and asked if JUSTICE wanted to encrypt the device.

    e.    At 6:06 a.m., JUSTICE's computer screen showed he had inserted a removable disk, and it displayed a status window that stated "Copying 29 items (77.7 MB)." The two folders, titled T and W, that appeared on the desktop also appeared in the removable disk at that point in time.

53.    On February 26, 2016, the UCE called JUSTICE and they arranged to meet on March 4, 2016; I have reviewed the audio recording of that telephone call.

54.    On March 4, 2016, JUSTICE met with the UCE again in Los Angeles County. I have reviewed the audio and video recording of that meeting, and in it the following occurred:

    a.    JUSTICE said that his mother was in town.

    b.    JUSTICE explained that he had accrued a lot of vacation time at work, and said: "I do like what I do. I like the people I work with very much and I have this fear in the back of my mind that if I'm gone too long they'll bring somebody behind me on my shift and I won't get to work with these people anymore."

    c.    JUSTICE explained "what it means to be risk averse": "It means uh, to be averse to something, it means you avoid it. You don't, you don't seek it, you do things to

- 35 -

eliminate it. So I'm very risk averse. So I try to think of things to make everything look normal."

      d.   In the context of discussing being risk averse, JUSTICE said: "It uh, I think it's important to what we're doing, to avoid suspicion, to not deviate from my pattern and I never um, when I'm getting ready to go in the evening, I never use the restroom at home." Specifically, JUSTICE explained: "Um, well when I left home tonight I wore my gym clothes, carried my gym bag like every other night. Go down, put on street clothes at the car. [Laugh] Um, um, when I park over here I call my wife and say 'OK I'm at the gym' like I do every night. Just, just maintain the pattern."

      e.   I have reviewed court-authorized surveillance of JUSTICE's telephone calls and on February 17, 2016 at 8:19 p.m. (Pacific Time), February 19, 2016 at 8:20 p.m., and March 4, 2016 at 8:30 p.m., JUSTICE told his wife that he was at the gym, when in fact he was in the vicinity of the location where the meetings with the UCE were held.

      f.   JUSTICE said: "I did um, I did want to apologize though for the samples I gave you last time. They weren't, maybe what your people were looking for." JUSTICE then explained what he brought to this meeting:

> I, well based on our conversation on the phone last week, uh I didn't bring any drawings. No, no, no uh schematics. Everything, everything that I brought is on the written test documents. Um, and I brought several from WGS, and I was looking around for TDRS documents and there's almost nothing and I asked why and I was told

that it was because the customer, NASA, in their,
in their contract, they get everything.  So they,
ya know, we take everything off our server and
give it to them with, with the spacecraft.  Um,
so I looked around uh everybody, all the
engineers have personal directories on the
shared, on the shared drive where they store
their work they're working on.  Excuse me.  And I
was able to pull a few things.  I found a few
things, both from this latest triad that we
built, and uh, some, actually more from what we
built 15 years ago.  Um, I know that's old and
you had mentioned the age on the last one, but
uh, contractually the space craft are identical.
They, they use all the same software and
everything.

g.   The UCE asked what type of programs JUSTICE
worked on and what he had access to that "you think would maybe
benefit us?"  JUSTICE said:  "I work mostly on, on civil and
military.  I do some with classified, but like I told you, it's
almost impossible to get anything out of that room."  JUSTICE
later said that he cannot get access to classified materials
because of the security measures in place that prevent access.
(Based on my review of JUSTICE's personnel files and a
government database that maintain records of persons with
security clearances, I do not believe JUSTICE in fact has a
security clearance to work on classified matters.)

h.   JUSTICE provided his opinion as to "what would
help the most" in terms of what he could acquire for the UCE.
JUSTICE provided one example:  "Like uh, units like uh, uh, like
amplifiers or transmitters or like one single case unit that
gets attached and plugged in.  To see what's inside that would
probably, would maybe be helpful more than seeing, like the

overall spacecraft." When the UCE asked "how would this help us?" JUSTICE replied: "Um, that would allow you to, um to see how it's put together and if you were trying to pick up on our transmissions, then you would know how the unit is put together and have an idea on maybe how to intercept the signal."

    i.    JUSTICE again confirmed that WGS allows communication with troops, that it "is strictly war fighter," and that "[w]ar fighter, um, that's military personnel, in the field, on active duty. It ah, it's their primary communication channel between each other. Between the base, ah, between Washington--." JUSTICE said he did not know exactly how it works, but it provides "communication between the guy in a ditch in Afghanistan and the guy in the base and on the people in the bunker." JUSTICE said he did not want to "oversell it" because he is a "nuts and bolts guy" and doesn't "do software," but what he "can tell from working with people who do that, um, it would allow you to know how um, all the individual units work and how they work together, um, and how the overall function of spacecraft is achieved."

    j.    JUSTICE mentioned other programs to which he could try to get access.

    k.    JUSTICE said he was aware of when military satellites launch.

    l.    The UCE asked some questions about what JUSTICE had provided before and that it looked like notes, and JUSTICE said "that wasn't intentional; I just went through and grabbed some things at random."

m.   The UCE asked JUSTICE about whether the information JUSTICE had provided was classified or not and noted that JUSTICE had referred to ITAR.   JUSTICE said "[e]verything that we have is going to be governed by ITAR."   They discussed that classified military information was kept more securely than what was ITAR and that JUSTICE could access.

n.   JUSTICE further explained that while the TDRS system "would be used to relay communications from classified launches, from military launches, not just from ISS or from spacecraft already in orbit."   JUSTICE explained that "you could use this info to track, be aware of and track classified launches, uh, it will help you to know where classified spacecraft is in orbit."

o.   JUSTICE provided the UCE with another USB thumb drive.   JUSTICE said:  "This um, is some documents that I put together on WGS and the few things I found on TDRS.   Like I said some of things on TDRS are, on that drive, are like 15 years old, um, but they're relevant because the three that we just built, are identical to the three we built 15 years ago, so everything is the same."   JUSTICE also wrote on a piece of paper "MILSTAR," an older satellite communication system he had discussed, "TDRS – NASA" and "Communications Relay" with the words "ISS," "Transfer Orbit," and "Space Shuttle," which he referred to during the meeting.   JUSTICE also wrote the name of a classified project (and wrote the word "CLASSIFIED"), though JUSTICE had said it was "highly classified" and that he did not work on it.

p.   Near the end of the meeting, the UCE provided JUSTICE with $1,000.00 in cash, which JUSTICE counted and verbally confirmed was one thousand dollars and then signed a written receipt for that cash.

q.   The UCE said "and until next time think about what will help my country to--to benefit us and maybe to get ahead.  You understand?"  JUSTICE replied "yes."

55.  I have reviewed results of an examination by the FBI on March 7, 2016 that the thumb drive provided by JUSTICE on March 4, 2016 was a 16-gigabyte SanDisk Ultra USB 3.0 digital storage device, and contained 26 files that all displayed Cleared Contractor A and/or Cleared Contractor B[6] proprietary labels, and six of the documents contained ITAR and/or Arms Export Control Act warnings.

56.  Twenty-four of the 26 files also appeared on the screenshots of JUSTICE's work computer in the early morning and late evening hours of March 2, 2016, as he was accessing and then transferring files off of Cleared Contractor A's computer systems.  (See paragraph 52.a above.)  Based on my review of the filenames, the 24 files observed by Cleared Contractor A's monitoring of JUSTICE's computer and the names of the files provided by JUSTICE to the UCE are the same.

57.  A Cleared Contractor A employee reviewed the specific sample documents that JUSTICE provided to the UCE on March 4,

---

[6]   Cleared Contractor A previously purchased Cleared Contractor B's space and communications business and related operations.

2016. One of the documents would cause him to be very concerned if it were compromised because it related to telemetry (communication and control over the satellite) and command, and how the WGS system is hardened against jamming. According to this employee, another document was significant because it allowed a way to bypass the encryption used by the satellite system and send information to the satellite. The employee further stated that some of the other documents were not particularly sensitive or might only be of interest to a country without an established satellite program, while others contained information about how to control the spacecraft, or that might help an adversary insert malicious software into a satellite. The employee opined that the documents taken in combination would present a greater concern than they would individually.

58. The documents that JUSTICE provided to the UCE on March 4, 2016, included the following four documents, identified herein as "Trade Secret 1" through "Trade Secret 4," that are proprietary to Cleared Contractor A. The information in each of these documents is a trade secret and is confidential and proprietary to Cleared Contractor A, which would be disadvantaged by the dissemination of any of these files, in particular in the context of bidding against competitors for government contracts on satellite projects.

a. Trade Secret 1 contains the plan to verify encryption and decryption functionality for communications with Cleared Contractor A's WGS satellites.

b.   Trade Secret 2 contains guidelines for running certain procedures used in testing the operation of Cleared Contractor A's WGS satellites on a specific testing platform.

c.   Trade Secret 3 is a plan for developing firmware that will be installed on a particular component of Cleared Contractor A's WGS satellites.  This is used to assure Cleared Contractor A's customers that Cleared Contractor A has, and adheres to, well-documented development procedures, which is critical in the context of competitive bids for projects requiring complicated firmware.  When the information in this plan is shared with prospective government customers, it is done pursuant to a proprietary information agreement requiring that confidentiality be maintained.

d.   Trade Secret 4 is a plan for testing the configuration of Cleared Contractor A's sensitive anti-jamming technology that it uses on its WGS satellites.

59.  On March 16, 2016, JUSTICE sent an envelope to C.M. containing some of the cash that the UCE had given JUSTICE. Specifically:

a.   I have reviewed physical surveillance records and the results of a court-authorized inspection of shipments that JUSTICE sent the aforementioned envelope through Fed Ex.

b.   I have reviewed a report of a court-authorized search of a shipment sent via Fed Ex on March 16, 2016 that was addressed to "Chay [M.]" at C.M.'s address, with telephone number (562) XXX-XXXX.  The sender's address listed on the

package JUSTICE sent was "Ajay" at Auto Service Business A, with a telephone number (310) XXX-4517.

c.   The telephone number listed on the Fed Ex addressee information, (562) XXX-XXXX, is the same telephone number that JUSTICE uses to communicate by telephone call and text message with C.M.

d.   The contents of the envelope, which was a sealed manila envelope, were photographed and I have reviewed those photographs.  Those photographs showed that JUSTICE sent $1,300.00 in cash.  One of the photographs showed two one hundred-dollar bills.  The serial numbers of those one hundred-dollar bills were the same as the serial numbers of the one hundred-dollar bills that the UCE had given to JUSTICE on March 4, 2016, which were also photographed before they were given to JUSTICE by the UCE.

e.   This shows that JUSTICE sent at least $200.00 of the $1,000.00 he received on March 4, 2016 from the UCE to C.M. via Fed Ex on March 16, 2016.

**Fourth Meeting with UCE on April 8, 2016**

60.  On March 18, 2016, the UCE called JUSTICE and they arranged to meet on April 8, 2016; I have reviewed the audio recording of that telephone call.  In that call JUSTICE agreed to meet with the UCE on April 8, 2016.  JUSTICE also said that he has access to a "piece of equipment" that does not "see the light of day," which JUSTICE said may be of interest to the UCE; JUSTICE wrote down the markings on the "piece of equipment" and said he would "pursue it quietly."  JUSTICE said he would also

- 43 -

try to obtain information about WGS, which was "strictly of military, strictly war fighter communications."

61.   As noted above, JUSTICE works an overnight shift.  I have reviewed screenshots of Cleared Contractor A's monitoring of JUSTICE's work computer, and they show that early in the mornings on April 6, 2016, April 7, 2016, and April 8, 2016, JUSTICE downloaded multiple files from Cleared Contractor A's computer systems.

a.   For example, on April 8, 2016 at 4:29 a.m., JUSTICE opened a folder titled "T."  Displayed in that folder on JUSTICE's screen were multiple files.  At 4:30 a.m., JUSTICE opened a folder titled "W."  Displayed in that folder on JUSTICE's screen were multiple files.  Additionally at 5:58 a.m., it appeared that JUSTICE created a file on the desktop titled "Anti Jamming Contract", which was subsequently transferred from the desktop to the removable disk.

b.   On April 6, 2016 at 5:46 a.m., JUSTICE's screen displayed a list of files he was accessing.  In one such screen, 14 files were displayed in a table.  In the column labeled "Proprietary," all were "Cleared Contractor A Enhanced (Proprietary)."  In the column labeled "Export Control," all with the exception of one indicated "ITAR."  This table displayed the title of the document and the type of document.

c.   On April 8, 2016 at 1:03 a.m., JUSTICE's work computer displayed a warning that he had inserted an unprotected medium into the computer, and asked if JUSTICE wanted to encrypt the device.

- 44 -

d.   Beginning at 4:29 a.m., JUSTICE's computer screen showed he had inserted a removable disk, and it displayed two status windows that stated "Copying 8 items (14.5 MB)" and "Copying 19 items (82.9 MB)." The two folders, titled T and W, that appeared on the desktop also appeared in the removable disk at that point in time.

e.   On April 5, 2016 at 5:55 a.m., JUSTICE's computer screen showed he had inserted a Smart card credential for greg.a.justice, and typed multiple characters in the PIN section before accessing Cleared Contractor A's Employee Timekeeping System.

62.   On April 8, 2016, JUSTICE met with the UCE again in Los Angeles County. I have reviewed the audio and video recording of that meeting, and in it the following occurred:

a.   JUSTICE and the UCE discussed the television show The Americans.

b.   When asked about the difference between ITAR and export-controlled, JUSTICE said: "I don't really have a firm understanding of, of, the subtleties between export control and ITAR. I know they deal with the kind of the same thing. Export control and international traffic is, um… the way I understand it is--they're sort of the same thing coming from different parts of the government."

c.   JUSTICE then explained: "Um okay so proprietary, this is going to be, this is going to relate directly to information. Actually to information ownership, and if that's [Cleared Contractor A] or DOD or, . . . , uh, proprietary um,

- 45 -

points to who owns the information."  The UCE asked if that
meant where the information comes from, and JUSTICE responded:
"Correct, and well, a lot of the . . . okay, so, when we bid on
a, on a spacecraft, they will tell us what they want it to do,
and we will develop the technology to have it be able to perform
those functions and that technology then, that we develop,
actually belongs to the customer because they paid us for it."

     d.   During the meeting, the UCE provided to JUSTICE
the first pages of four of the documents JUSTICE had previously
given to the UCE on February 19, 2016.

     e.   When asked who the customers usually are, JUSTICE
answered:  "Yea, so, so the DOD, Department of Defense, that's
all the military. [Mumbling as he is writing things down for
UCE] Army, Air Force . . . .  Okay so ITAR, um, this is a very
good question and, and I wasn't completely prepared for it."
When the UCE asked for an explanation in simple terms, JUSTICE
said ITAR is "more of a, it's a agreement" similar to the North
American Free Trade Agreement in that "ITAR is like an
international agreement versus export control, which is um,
something set by the government, set by our government alone, to
control technology and keep it within our country."  JUSTICE
said export control applies to "anything.  Um, from the, the,
the frequency that all these different antennas broadcast on, to
the type of metal used in all these screws, to the techniques we
use for gold plating. It's all, it all falls under the umbrella
of export control."  JUSTICE and the UCE then reviewed one of
the first pages of the documents JUSTICE had previously

provided, and when the UCE pointed out "here's ITAR, yes,"
JUSTICE replied:  "Yea.  The, the, the big warning is always
gunna just, just be on the first page."

      f.  With respect to one of the printed documents that
JUSTICE had previously provided to the UCE on a USB drive that
they reviewed together, JUSTICE said:  "Two of the things that
I, that intrigued me about this is and were the reasons that I
sent this as kind of a introduction, is because this is one of
the only things that we have that uses actual optics. Like so
there's actually, right here, this guy right here, that's a
camera."  JUSTICE then explained:

> Yea.  So um, that's a camera and um, and there
> are three different orbital elevations.  There is
> geosynchronous uh which is, okay so there's
> [JUSTICE writing on paper for UCE]. Which is
> about 23,000 miles over head.  There's medium
> which is about 5,000 miles and there's low earth
> orbit, which is 250 miles.  This is uh, ISS and
> GPS.  So there, there's more than 50 of these
> orbiting at 250 miles overhead with a very high
> powered camera attached facing the earth.  So
> this is constantly taking pictures, very high
> resolution pictures of the earth.  So that's why
> I, I, I uh mentioned this is not only for
> navigation like on your phone, this is actually
> for surveillance.

      g.  JUSTICE stated:  "So those are the two reasons
that I thought that this would be interesting," he said "[t]his
is all GPS, and that "it's current."

      h.  JUSTICE stated:  "When you called last time I
mentioned, uh, I was, I had an opportunity to be, to observe a
classified unit."  JUSTICE explained it was from WGS, for the

Air Force, and that "we're building 10 of these spacecraft."
JUSTICE explained further:

> Well, right now there are seven flying, and we're
> building eight, nine and ten.  Um, so the first
> six are US only.  Seven through ten, they're,
> they sold a certain amount of payload capacity to
> . . . several other countries um, so, so, so
> seven through ten there is an international
> access to these, to these things.  Um, the only,
> the only item on WGS that is actually classified,
> everything on the payload is, is open area.  The
> only thing that's classified is called the
> ["Specified Satellite Component"]. . . .  Um, and
> the markings are so secret that as soon as
> they're exposed the markings are covered, they
> can't even be photographed.  I was in a room
> where they were doing, two other engineers were
> doing what they call bench test, just on a table
> hooking up to different equipment to test its
> function, and walked past, back and forth several
> times, and I wrote down the best I could, what
> those markings are.  While they were uncovered.

       i.   When the UCE asked for a brief explanation of the
Specified Satellite Component, JUSTICE provided further details.

       j.   After providing a handwritten document related to
the Specified Satellite Component, JUSTICE explained what else
he brought:  "I brought more files like, like last time and most
of them have to do with testing with this, for WGS. I brought, I
was able to find some more for TDRS as well, but I, there's just
not very much left."

       k.   Returning to the Specified Satellite Component,
JUSTICE explained that U.S. allies would not likely have access
to it.  JUSTICE said that "if they want, I can get, I can get
schematics like this for that," referring to the Specified
Satellite Component.

- 48 -

l.   JUSTICE and the UCE discussed whether JUSTICE should continue to get schematics, and the UCE said that some of the schematics were interesting.  The UCE said "[m]aybe you know something that will help our country," to which JUSTICE said: "Sure.  Sure."

m.   The UCE provided JUSTICE with $1,000.00 in cash, and JUSTICE signed a receipt for it.

n.   JUSTICE said he had not contacted any other countries and that he did not go to any embassies.  JUSTICE reiterated that he was risk averse, and explained:  "The reason that I sent this and I'm talking to you now, is because I've weighed the options and this is less risky to me than not.  Than not trying to do something to help myself out of the hole I'm in.  Going to someone else and creating competition for you, creates risk for me."  JUSTICE and the UCE discussed how they wanted to try to build the type of relationship that existed in The Americans.

o.   JUSTICE stated:  "Actually something that I have thought about, um, when we, when we do our uh, security briefings, our, our, our background and everything, um, part of that is uh taking what they call a polygraph test, and when they ask me if I've contacted, or spoken to someone from another country or someone from another embassy, which is one of the questions that they ask. Um, I, I might have trouble passing that question."  The UCE then stated that he was not actually from the embassy, and that he was an American citizen.  JUSTICE said, referring to the question about foreign contacts, "that

- 49 -

was the big one that I had, that was in my mind because ya know, have you, how did they, how did they phrase it last time, do, have I, excuse me, have I met with any foreign persons more than three times, like an ongoing relationship." The UCE again said that he was an American citizen, to which JUSTICE replied: "Yes, but I did contact your embassy before I, before you called me." JUSTICE said he had had to answer this question twice before, most recently a year and a half before.

   p.   Near the end of the meeting, JUSTICE provides the UCE with a USB thumb drive.

   q.   JUSTICE offered "if you think next time they want um schematics for, for the [Specified Satellite Component], um I will--" to which the UCE said they wanted more related to it.

   r.   JUSTICE said he would look into that and into whether additional WGS or GPS materials were of interest. He also stated that he would see if he could do some research to better answer the UCE's question regarding ITAR and export control.

   63.   I have reviewed the results of an examination by the FBI on April 12, 2016 that the thumb drive provided by JUSTICE on April 8, 2016 was a 4-gigabyte Dane-Elec USB digital storage device, and contained 28 files that all displayed Cleared Contractor A and/or Cleared Contractor B proprietary labels affixed to the page.

   64.   Twenty-eight of the 28 files also appeared on the screenshots of JUSTICE's work computer in the early morning hours of April 8, 2016 as he was accessing and then transferring

files off of Cleared Contractor A's computer systems.  (See
paragraph 61.a above.)  Based on my review of the filenames, all
28 files observed by Cleared Contractor A's monitoring of
JUSTICE's computer and the names of the files provided by
JUSTICE to the UCE, as described in paragraph 63 above, are the
same.

     65.  On April 13, 2016, JUSTICE sent an envelope to C.M.
containing the cash that the UCE had given JUSTICE.
Specifically:

          a.   I have reviewed physical surveillance records and
the results of a court-authorized inspection of shipments that
JUSTICE sent the aforementioned envelope through Fed Ex.

          b.   I have reviewed a report of a court-authorized
search of a shipment sent via Fed Ex on April 13, 2016 that was
addressed to "Chay [M.]" at C.M.'s address.  The address label
also listed telephone number (562) XXX-XXXX.  The sender's
address listed on the package JUSTICE sent was "Ajay" Auto
Service Business A, with a telephone number (310) XXX-4517.

          c.   The telephone number listed on the Fed Ex
addressee information, (562) XXX-XXXX, is the same telephone
number that JUSTICE uses to communicate by telephone call and
text message with C.M.

          d.   The contents of the envelope, which was a sealed
manila envelope, were photographed and I have reviewed those
photographs.  One of the photographs showed ten one hundred-
dollar bills.  The serial numbers of those one hundred-dollar
bills were the same as the serial numbers of the one hundred-

dollar bills that the UCE had given to JUSTICE on April 8, 2016, which were also photographed before they were given to JUSTICE by the UCE.

      e.   This evidence shows that JUSTICE sent to C.M. via Fed Ex all $1,000.00 of the $1,000.00 that he received on April 8, 2016, from the UCE.

### *Telephone Call on April 23, 2016*

      66.  On April 23, 2016, the UCE called JUSTICE and they arranged to talk via telephone again on May 5, 2016 to determine the next meeting. I have reviewed the audio recording of that telephone call. In that call, JUSTICE agreed to speak again on May 5, 2016.

      a.   Also during the course of that call, JUSTICE said his wife "went in and did something called a sleep study, which is where they, they observe you while you sleep, and try to diagnose problems based on that. . . . they gave her a prescription for a muscle relaxer to, you know loosen up her chest and help her breathe, but it, since, since this prescription didn't come from our primary doctor, the pharmacy won't fill it and I was wondering if, and I know this out of left field, but I was wondering if you would have access to anything like that?"

      b.   The UCE asked if JUSTICE could provide the name of the prescription, and JUSTICE replied: "I'm not sure on the pronunciation, it's called Anectine,[7] I'll spell it for you.

---

7    According to the Food and Drug Administration, anectine (succinylcholine chloride) is an ultra short-acting

That's A, N as in November, E as in Echo, T as in Thomas, I'm sorry, A-N-E, E as in Echo, C as in Charlie, T as in Thomas, I, N as in November, E as in Echo." The UCE asked if there was some number of milligrams and quantity on the prescription; JUSTICE replied: "Um, I, I believe that there is, but the pharmacy has the paper, the prescription it that it was written on. So I don't. . . . It's. it's, it's, it's with the insurance, and um, they, they do this quite often, the last time they did this it took almost two months to straighten out. . . . the prescription is for I think 3 vials. It's uh, uh an injection. I think the prescript. Was for 3 vials. But, if, if you could just bring one just to tie it over, if you could bring any at all, you know, and I hate to put you on the spot like this but I'm, I'm, I'm trying to exhaust all resources to get this for her."

    67. I learned from FBI SAs who have had discussions with a Cleared Contractor A security employee that on March 26, 2016, JUSTICE received a blank email with subject line "Succinylcholine" from a co-worker.

    68. I learned from my review of a physical surveillance report that when JUSTICE went to a Fed Ex location on April 26,

---

depolarizing-type, skeletal muscle relaxant for intravenous (IV) administration. Based on this open-source, publically available information, the FDA has issued a warning for succinylcholine, which in summary is described for being associated with rapid muscle breakdown resulting in life-threatening heart rhythms, cardiac arrest, and death in children. Additionally, succinylcholine is given as an injection at a doctor's office, hospital, or clinic.

2016, JUSTICE searched on one of the computers there for "injection solution" and then for "pharmacy" on the Internet utilizing a publically available computer at Fed Ex.

69.  I reviewed a letter sent to FBI SAs from a medical doctor at JUSTICE's wife's sleep disorder diagnostic facility (Sleep Center A) confirming that they have not been involved with pharmacological treatment as part of their clinical care. "Sleep technologists are involved in the monitoring of patients who come in for sleep studies and are not involved in administering therapies in general and treatment with Anectine in particular."

70.  I have also reviewed records provided by Fed Ex that contained the website addresses accessed by the computer JUSTICE used at a Fed Ex location in April 2016.  I have reviewed one of those websites, and it contained a description of how the author suspected succinylcholine had been used in a murder and why it was an effective poison.

71.  This evidence shows that the sleep center did not in fact prescribe anectine, a medication typically administered in a hospital environment, contrary to JUSTICE's claims to the UCE.

**Fifth Meeting with UCE on May 12, 2016**

72.  On May 5, 2016, the UCE called JUSTICE and they arranged to meet on May 12, 2016.  I have reviewed the audio recording of that telephone call.  In that call, JUSTICE agreed to meet with the UCE on May 12, 2016.

a.   JUSTICE asked if the UCE's "people" had clarified what they wanted with respect to the "piece of cloth" (i.e., the

- 54 -

Specified Satellite Component details JUSTICE had provided).

JUSTICE said "I believe that, that the collection of schematics
is almost complete. I, I want to go through and, and double
check everything one more time. But uh I think that those are
fairly complete now and ready for you." JUSTICE also said:
"Um, um, yea, so, so just to be clear, um, with, with the notes
that I gave you last time, on the drawings that you provided,
did they, they did want to pursue that." JUSTICE continued:
"So what I wrote down on the cloth, what I gave you, um, I gave
you uh, written test procedures for that piece of equipment.
And when you come next week I'll have the schematics to be able
to reproduce that piece of equipment physically. Um, and, so,
so with that you should be fairly complete with that, with that
particular item."

    b.   The UCE also asked if JUSTICE still needed the
"favor" for which JUSTICE had asked. JUSTICE apologized "for
bringing that to you and, and putting you on the spot like
that." JUSTICE said: "Um, yes, uh, we've, we've haven't been
able to resolve this with our primary doctor. . . . And I, any,
anything that can happen with that is, is useful. Um, the, the
same thing happened to me a few years ago when I was
transferring to graveyard shifts, what I'm on now, um, they gave
me a medication, a prescription for medication to help keep me
awake at night and sleep during the day." JUSTICE said he got
it from a walk-in clinic because he had not been able to get an
appointment with his primary doctor, but successfully got the
medicine online from a pharmacy in Europe. JUSTICE then said:

- 55 -

"What I asked you for, I can't find online."  The UCE said he
could get it for JUSTICE, that it may take a couple of weeks to
get it, and that there would be one or maybe two vials.  JUSTICE
replies, "Oh wow. Okay. Yea anything, I would be very grateful
for, for anything."

73.  As noted above, JUSTICE works an overnight shift.  I
have reviewed screenshots of Cleared Contractor A's monitoring
of JUSTICE's work computer, and they show that late in the
evenings on April 22 2016 and May 7, 2016, JUSTICE downloaded
multiple files from Cleared Contractor A's computer systems.

a.    For example, on May 7, 2016 at 11:18 p.m.,
JUSTICE's work computer displayed a warning that he had inserted
an unprotected medium into the computer, and asked if JUSTICE
wanted to encrypt the device.  At 11:36 p.m., JUSTICE opened a
folder titled "C."  Displayed in that folder on JUSTICE's screen
were multiple files.  At 11:38 p.m., files titled mc409-0250a
and ITAR Impacts to Export Compliance along with the "C" folder
were displayed in the folder corresponding to the USB drive.

b.    On April 22, 2016 at 10:21 p.m., JUSTICE's screen
displayed a list of files he was accessing.  In one such screen,
11 files were displayed in a table.  In the column labeled
"Proprietary," all were "Cleared Contractor A Enhanced
(Proprietary)."  In the column labeled "Export Control," all
with the exception of one indicated "ITAR."  This table
displayed the title of the document and the type of document.

c.    Beginning at 11:26 p.m., JUSTICE's computer
screen showed he had inserted a removable disk, and it displayed

- 56 -

a status window that stated "Copying 15 items (11.4 MB)." The
folder titled C which appeared on the desktop also appeared in
the removable USB disk at that point in time.

74. On May 12, 2016, JUSTICE met with the UCE again at a
location in Los Angeles County. I have reviewed the audio and
video recording of that meeting, and in it the following
occurred:

a. JUSTICE and the UCE discussed the television show
The Americans.

b. JUSTICE recalled that last time the UCE had asked
about the meaning of ITAR and export-controlled information.
JUSTICE said "I asked some people and I did some reading."
JUSTICE explained there are subtle differences between the
language, but the primary difference is that "export control is
written and controlled by the Department of Commerce; ITAR is
written and controlled by the Department of Defense." JUSTICE
explained that export control covers commercial and civilian
uses, and ITAR covers military or commercial use. JUSTICE
explained that one would see both markings on almost everything
Cleared Contractor A publishes. JUSTICE also said he found a
seven-year-old presentation on their server that covers this,
and brought an electronic copy of it on a USB thumb drive to the
meeting.

c. JUSTICE explained that he chose the information
he had brought to their last meeting--the Specified Satellite
Component--because it was equipment that was usually covered up,
but he managed to see it. JUSTICE said: "What I brought

- 57 -

tonight is the schematics for how it's built." JUSTICE
explained that it was one thing to understand how to test the
equipment, but it was another to be able to build it and then
test it oneself.

   d. The UCE asked if JUSTICE had provided everything
needed to build the Specified Satellite Component--such as
mechanical, electrical, physical information--and JUSTICE said
he had. JUSTICE later said that he had provided all of the
schematics except for the actual box it goes in, but that was
not important, rather it was what was inside the box that was
important. JUSTICE explained that the files included seven or
eight parts lists for the Specified Satellite Component, which
were at different levels and described and illustrated certain
parts. These were included on the USB thumb drive that JUSTICE
provided to the UCE at this meeting.

   e. JUSTICE explained that in addition to Cleared
Contractor A, there was another contractor in France, and a few
other companies that take different paths to build satellites.
Each company makes a different "class" of satellite, which
JUSTICE likened to a model of a car. JUSTICE explained that
there are two primary pieces of the satellite.

   i. The first is the bus, which is responsible
for achieving orbit and for station--in other words, not only
getting the satellite into orbit, but keeping it in the right
spot using propulsion. The bus is also responsible for the
interface between the ground station controlling the satellite
and the satellite, and that if one can control that, one can

control the satellite.  JUSTICE did not know why the Specified Satellite Component was sensitive, he just knew that it was covered up.

ii.    The second part is the payload, which is why the spacecraft is up in space.  For these satellites, it takes signal from the customer and puts signal out.  The payload includes the antenna.  The payload is the purpose for building the satellite, and includes the channelizer.  That takes incoming signal, and figures out where it is supposed to go and gets it to the right place.  JUSTICE said it was also covered, but JUSTICE said he would look for it.

f.    JUSTICE said that for the WGS communications satellites, numbers one through seven were build and were only for use by the United States Air Force.  JUSTICE explained the status of the next batch of satellites, that they were designed to be used both by the United States and by certain foreign countries, and that some of those satellites were completed while others were still being made.  All of these satellites, according to JUSTICE, allowed for secure military communications.

g.    JUSTICE discussed the Specified Satellite Component further, stating that "even on a commercial spacecraft, the [Specified Satellite Component] is sensitive."

h.    JUSTICE elaborated that the WGS currently provides secure space-based communications for the United States Air Force only, and it was important because there was almost no relay involved.  For example, JUSTICE said if a commander in

- 59 -

Afghanistan needed information from Washington, his communication will go straight to a satellite, then to other satellites, and then to his general in Washington, without anyone else involved in the communications.

i.     JUSTICE and the UCE discussed how at their last meeting, JUSTICE had provided an article discussing security, specifically when a satellite was in orbit, and how to keep it from being hacked.  JUSTICE said it would not be difficult for him to figure out what kind of software was being used on the satellites now, for example, for GPS satellites.

j.     Near the end of the meeting, the UCE provided JUSTICE with $1,000.00 in cash, which JUSTICE counted and verbally confirmed was one thousand dollars and then signed a written receipt for that cash. In exchange, JUSTICE provided the UCE with a USB thumb drive.

k.     JUSTICE said he still needed the anectine. JUSTICE also said that his wife had previously been given anectine: "That anectine was one of the things they gave her to relax her entire chest so she could breathe." JUSTICE explained that his wife had gained weight, and that she had difficulty breathing, but that as soon as she received a shot with anectine, instantly she could breathe.

l.     JUSTICE said that for next time he would try to look for information on the channelizer. JUSTICE also said that the money was "taking some stress away" and that he was "able to clear some debts."

m.    While until this point, JUSTICE had only used the name "Brian" with the UCE, at the end of the interview JUSTICE introduced himself as "Greg."

75.    I have reviewed the results of an examination by the FBI on May 13, 2016 that the thumb drive provided by JUSTICE on May 12, 2016 was a 16-gigabyte PNY USB digital storage device, and contained 19 files that all displayed Cleared Contractor A and Cleared Contractor B proprietary labels affixed to the page.

76.    Nineteen of the 19 files also appeared on the screenshots of JUSTICE's work computer in the late evening hours of April 22, 2016 and May 7, 2016 as he was accessing and then transferring files off of Cleared Contractor A's computer systems.   (See paragraph 73.a above.)   Based on my review of the filenames, all 19 files observed by Cleared Contractor A's monitoring of JUSTICE's computer and the names of the files provided by JUSTICE to the UCE, as described in paragraph 75 above, are the same.

**D.    Preliminary Determination by DDTC**

77.    I learned that a total of 10 files provided by JUSTICE to the UCE on thumb drives (five from February 19, 2016, and five from March 4, 2016) were submitted to the Directorate of Defense Trade Controls (DDTC).   Those files included five files given to the UCE by JUSTICE on February 19, 2016, and five files given to the UCE by JUSTICE on March 4, 2016, including Trade Secrets 1-4.

78.    I have reviewed the preliminary determination provided by DDTC dated May 2, 2016, which indicated that the contents of

each of those documents were covered by Category XV(f) of the
USML because it contains information used for the operation of
military satellites.  Category XV(f) of the USML applies
technical data related to spacecraft systems and associated
equipment.

79.  I have also reviewed a regulatory review letter dated
June 22, 2016 that resulted from DDTC's review of Trade Secrets
1-4, all of which pertain to the WGS, the military
communications satellite controlled under United States
Munitions List Category XV(a)(13).  That letter determined that
Trade Secrets 1-4 were technical data subject to the
jurisdiction of the Department of State in accordance with the
ITAR (22 C.F.R. Parts 120-130) during the period of August 2015
to the present.  As a result, a license or other approval was
required pursuant to the ITAR prior to any export.

80.  I learned from FBI SAs who have had discussions with
U.S. Air Force Office of Special Investigations who reviewed
certain files that while some of them had "no obvious
intelligence value," some of "these drawings could, depending on
other information not available, have some intelligence value to
an adversary."  As to one of the files, the "package of drawings
has some intelligence value . . . these drawings, by showing the
various antennas in a scalable way, allows the adversary to
compare the known signals with visible antenna, confirming or
denying any hypotheses regarding the existence of specific
signals."  The comments were essentially the same for another
file that JUSTICE provided.

81. Furthermore, I learned from FBI SAs who have had
discussions with a Cleared Contractor A employee who reviewed
the same files that "such information would be potentially
valuable to a foreign entity that did not already have a
satellite program, but otherwise wouldn't be useful to a
developed power unless they really wanted to know exactly how
our existing satellites were put together. [File A] does show
the configuration of the antennas. This was important because
they can interfere with each other, but now computer programs
can tell you how to arrange them."

82. I learned from FBI SAs who have had discussions with a
Cleared Contractor A employee who reviewed the files that
Cleared Contractor A was "concerned about [Trade Secret 4]
because it deals with Telemetry and Command, and how the WGS
system is hardened against jamming. WGS is unique in that it
doesn't use frequency hopping." Furthermore, they would be
concerned if another file were intentionally compromised, "as it
describes how to bypass the encryption to send information to
the satellite." Also, while [File F] would be "mostly useful to
a country just starting a satellite program, it did have
information that might help an adversary insert malicious
software."

## E.   Drug Shipments

83. I have reviewed physical surveillance records,
receipts and records obtained from Fed Ex, and the results of
court-authorized inspection of packages that JUSTICE sent
through Fed Ex that show JUSTICE had sent packages containing

drugs, and the descriptions below of those packages are based on those sources.

84.   I have reviewed court-authorized surveillance of telephone and text-messaging records between JUSTICE and a person referenced herein by his initials, "J.P." On January 5, 2016, J.P. sent JUSTICE a text message "Hey buddy, there's a package headed to [Auto Service Business A.] Thanks to our mutual friend, DL the app . . . Secure messaging." On January 8, 2016, JUSTICE replied, "Just got it installed. My . . . ID is metalhead66. What's up?" On February 14, 2016, J.P. sent JUSTICE a text message "Hey Greg call me ASAP, need you to drop off some car parts to a client if possible."[8]

85.   The same day, J.P. called JUSTICE. In that phone call conversation, JUSTICE asked: "So look at, the work, so let, let me ask you this. What parts are you, are you give to this guy?" J.P. replied: "Uh, water parts. Um, speaking in code sir." JUSTICE replied: "Ah. Okay, those, those parts." J.P. asked: "Which office are those are at?" JUSTICE replied: "Uh those are, those parts are also at home. . . . Cause remember the, the, the size of the original box um, uh because this one's bigger than the last one. . . . The last one came in two mediums and this one came in one large. Uh so I, I can't like, get it into my office at work." J.P. replied:

> Okay. Well, um, this person needs three um, and
> is trying to meet, well he's trying to restart
> with me cause it's been a while and he, he, takes

---

[8] Both JUSTICE and J.P. are believed to engage in some auto repair business.

a break every once in a while to just for
security which is great, um, but uh, so he's
trying to get back to work and uh, but he's got
his people that are ready to go and, so he's just
uh, trying to make this happen by early tomorrow
morning [unintelligible] he, he was going to go
elsewhere tonight, and I was like, well ya know,
trying to make this happen blah, blah, blah.  So
if we can do this by ya know, by like noon
tomorrow or so, then he's willing to work with
me, otherwise he's going elsewhere and ya know,
imagine that. I know this is real short notice
and everything, so if not I understand that.

     a.   In that same telephone conversation, JUSTICE then

said:  "Okay.  Would he be able to meet me at my place at like

10 o'clock tomorrow morning?"  J.P. replied:  "He can go and

meet wherever you like."  JUSTICE replied:  "Yea have him uh, do

you remember where I live?"  J.P. replied:  "Behind the bush,

and you're gunna meet him there or if you don't mind meeting in

person do that, whatever makes you happy . . . . You know me, I

wouldn't bring anybody near you that wasn't solid.  I know its

involved but."  JUSTICE replied:  "No, no, no that's fine, um

yea, tell him, tell him that I."  J.P. interjected and said:

"Not Marina, what's that place called up just north of, what is

it called?"  JUSTICE said:  "Culver City."  On February 15,

2016, JUSTICE replied by text message:  "Box is ready for

pickup, as described."  Later the same day, JUSTICE sent J.P. a

text message stating:  "I'm going to guess that he did [come by]

because the water is gone."

     b.   On November 20, 2015, physical surveillance

observed, in plain view in JUSTICE's vehicle, a printed receipt

for a UPS mailing package addressed to "[J.P]" at an address in

Panama City, Florida, as the recipient.  A search of law enforcement databases showed that a telephone number associated with J.P. was utilized to contact JUSTICE.  This telephone number was also used on a Fed Ex package that JUSTICE sent on December 10, 2015, to an individual identified herein by his initials, "A.O.," at Address A in Compton, California.

c.  I have reviewed a physical surveillance record that described JUSTICE meeting with J.P. at a hotel on April 9, 2016.  During that meeting at approximately 11:04 p.m., J.P. handed JUSTICE cash and JUSTICE put that cash in his left back pocket; the amount was unknown.  JUSTICE then departed the hotel and returned at 11:16 p.m., when JUSTICE was observed returning to the hotel with what appeared to be medium-sized water bottles.  At 11:30 p.m., both JUSTICE and J.P. departed the hotel.

86.  On March 4, 2016, JUSTICE sent two packages through Fed Ex that weighed approximately 10.4 pounds and measured 15 x 9 x 7 inches and 9.8 pounds and measured 15 x 9 x 7 inches that each contained a List I regulated chemical.

a.  I have reviewed photographs taken during a court-authorized inspection of both packages from "sender" Auto Service Business A[9], with a telephone number (310) XXX-4517, to

---

[9]  The sender address on this package is the same address listed in paragraph 26.a.iv., but the phone number listed is different; JUSTICE utilizes that phone number to communicate with a person he refers to as J.P., sometimes in code, about what appear to be these drug shipments.  Furthermore, JUSTICE appears to utilize another phone application, which is a phone-to-phone encrypted messaging service.

Address A in Compton, California.[10]  One of the packages

contained three clear liquid-filled "Smart Water" brand bottles

and paper-shredding for insulation inside an Amazon shipping

box, and the other package also contained three clear liquid-

filled "Smart Water" brand bottles, paper-shredding, and packing

peanuts for insulation inside the other Amazon shipping box,

which, as described in paragraph 86.c below, was used by JUSTICE

to pack the shipment.

      b.    I have reviewed court-authorized surveillance of

telephone and text-messaging records between JUSTICE and J.P.,

and on February 22, 2016, JUSTICE asked J.P. if he can "send you

a pic?"  J.P. replied, "sure shoot IT," then, "OK . . .  That

seems less than we should have."  JUSTICE replied, "That's what

I was thinking.  We've only used about 10, which means if it was

full there's only about 5 left.  Unless I'm remembering wrong.

I'll measure some out in the morning and get a better estimate."

J.P. replied:  "Need 6 to Compton."  JUSTICE replied:  "I'll

decant as much as I can.  When does Compton need it?"

      c.    I have reviewed physical surveillance records

that place JUSTICE at Fed Ex on March 4, 2016 and upon arriving

and entering Fed Ex 6:37 a.m., JUSTICE returned to his vehicle

with a large tape dispenser.  JUSTICE taped two boxes in the

trunk of his vehicle; the boxes appeared to be Amazon shipping

boxes.  At 6:44 a.m., JUSTICE reentered Fed Ex with the two

---

[10]    Address A is the same Compton address noted above in
paragraph 855.b, but the recipient name on this package was
different.

boxes and proceeded to the shipping counter.  At 6:57 a.m.,
JUSTICE exited the Fed Ex with a white piece of paper which
appeared to have had two labels removed.

      d.  Based on subscriber and toll records I have
reviewed and on the records of JUSTICE's repeated contact with
C.M., JUSTICE subscribed to and utilized telephone number (310)
XXX-4517 (the number that appears as the sender's in paragraph
86.a) from October 1, 2014 to August 27, 2015 when there was a
break in service.  JUSTICE has used this telephone number with
packages he sent from Fed Ex when also using the name Auto
Service Business A as the "sender" of the package.  JUSTICE has
done that for packages that were sent to Address A in Compton,
California, on September 3, 2015, as well as packages JUSTICE
sent to C.M. on multiple occasions in 2015 and 2016.

      e.  I have reviewed a physical surveillance record
and database checks for Address A in Compton, California, and it
appeared to be a residential property.  Residents at this
address were property owners A.O. Sr. and M.O., as well as A.O.
Jr.  A.O. Jr.'s criminal history includes multiple charges and
arrests, including possession of a controlled substance in
September 2015 (deferred judgment), local ordinance violation in
November 2010 (convicted on one of two counts), and assault and
battery in October 2005 (convicted on one misdemeanor count in
April 2006, then early dismissal from probation in April 2007).

      f.  I have reviewed the results of an examination by
the FBI Laboratory dated March 22, 2016, indicating that a
sample of liquid taken from that shipment was determined to be

gamma-hydroxybutyric acid lactone, which is also known as gamma-butyrolactone or GBL, and which I learned from my review of other materials is a List I regulated chemical.[11]

87.   On March 28, 2016, JUSTICE sent a package through Fed Ex that weighted approximately 8.1 pounds and measured 13 x 10 x 7 inches, and which also contained GBL, a List I regulated chemical.

a.   I have reviewed photographs taken during a court-authorized inspection of the package from sender "[J.P.]," Auto Service Business A, to an individual identified herein by the initials "J.L." at an address in Hermosa Beach, California 90254, which contained two clear liquid-filled "Smart Water" brand bottles and paper-shredding for insulation.

b.   I have reviewed physical surveillance records that place JUSTICE at Fed Ex on March 28, 2016 and upon arriving

---

[11]   According to the Drug Enforcement Administration, GBL is a substitute for gamma-hydroxybutyric acid, or GHB.  GBL is sold as a "fish tank cleaner," "ink stain remover." "ink cartridge cleaner," and "nail enamel remover" for approximately $100 per bottle – much more expensive than comparable products.  It can also be used for graffiti removal.  GHB and its analogues, including GBL, are abused for their euphoric and calming effects and because some people believe they build muscles and cause weight loss.  It is also misused for their ability to increase libido, suggestibility, passivity, and to cause amnesia – traits that make users vulnerable to sexual assault and other criminal acts.  Use of GHB produces Central Nervous System depressant effects including euphoria, drowsiness, decreased anxiety, confusion, and memory impairment.  GHB can also produce visual hallucinations as well as excited and aggressive behavior.  GHB is a Schedule I controlled substance, meaning that it has a high potential for abuse, no currently accepted medical use in treatment in the United States, and a lack of accepted safety for use under medical supervision.  GBL is a List I regulated chemical.

and entering Fed Ex at 6:29 a.m., JUSTICE retrieved a box inside the Fed Ex store then exited with said box and tape at 6:34 a.m. JUSTICE entered his vehicle with the unpacked box, then exited his vehicle with the box taped and sealed, then reentered the Fed Ex at 6:40 a.m.  JUSTICE exited the Fed Ex with a receipt at 6:49 a.m.

       c.   The telephone number listed in both the sender and addressee fields of this package belongs to J.P. Previously, JUSTICE has used J.P.'s name (including J.P's first and middle names on January 13, 2015) to ship packages from Fed Ex, but consistently utilizes the Auto Service Business A address.

       d.   I have reviewed database checks and the Hermosa Beach, California, address returns to an individual identified herein by the initials "L.L." as the owner.  According to public information, L.L. is employed at Cleared Contractor A and has also associated with J.P. via social media.

       e.   I have reviewed the results of an examination by the FBI Laboratory dated April 21, 2016, that show the sample of liquid taken from that shipment was determined to be gamma-hydroxybutyric acid lactone, which is also known as gamma-butyrolactone or GBL, which, as noted above, is a List I regulated chemical, as described above.

## IV.   REQUEST FOR SEALING

88.  The investigation is ongoing.  Disclosure of the contents of this affidavit would seriously impede the investigation by revealing details of the government's

investigation and evidence gathered in connection therewith.  It would alert JUSTICE as well as his co-conspirators to the fact of the government's investigation, and would cause them to alter their conduct to evade further detection.  It would also likely cause them to flee and/or destroy any evidence of the criminal conduct described herein, or potentially to manufacture evidence concealing the true nature of their conduct.  Accordingly, I request that the Court issue an order sealing this affidavit, the complaint, and the arrest warrant until further order of this Court.

## V.   CONCLUSION

89.  Based on the above facts, and on my training and prior experience, I believe that there is probable cause to believe that GREGORY ALLEN JUSTICE has violated Title 18, United States Code, Sections 1831 (Economic Espionage), Title 22, United States Code, Section 2778(c) (the Arms Export Control Act, or "AECA"), and Title 22, Code of Federal Regulations, Parts 120-130 (the International Traffic in Arms Regulations, or "ITAR");

///

and I respectfully request that the Court issue the requested
criminal complaint and arrest warrant.

_____
PETER LEE
Special Agent
Federal Bureau of Investigation


Sworn and subscribed to before me
on this 1st day of July 2016

_____
HONORABLE ALICIA G. ROSENBERG
UNITED STATES MAGISTRATE JUDGE

- 72 -