SANDRA R. BROWN
Acting United States Attorney
PATRICK R. FITZGERALD
Assistant United States Attorney
Chief, National Security Division
ANTHONY J. LEWIS (Cal. Bar No. 231825)
Assistant United States Attorney
Deputy Chief, Terrorism and Export Crimes Section
MELISSA MILLS (Cal. Bar No. 248529)
Terrorism and Export Crimes Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-1786/0627
    Facsimile: (213) 894-2927
    E-mail:  anthony.lewis@usdoj.gov
         melissa.mills@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>       v.<br><br>GREGORY ALLEN JUSTICE,<br><br>       Defendant. | No. CR 16-499-GW<br><br>GOVERNMENT'S RESPONSE TO PRE-SENTENCE INVESTIGATION REPORT AND POSITION WITH RESPECT TO SENTENCING OF DEFENDANT GREGORY ALLEN JUSTICE; EXHIBITS<br><br>Sentencing Date:  Sept. 18, 2017<br>Sentencing Time:  8:00 a.m. |

Plaintiff United States of America, by and through its counsel of record, the Office of the United States Attorney for the Central District of California and undersigned counsel, hereby files the Government's Response to Pre-Sentence Investigation Report and Position with Respect to Sentencing of Defendant Gregory Allen Justice.

The government's sentencing position and response to the Pre-Sentence Investigation Report (the "PSR") is based upon the attached sentencing memorandum and exhibits, the files and records in this

case including the PSR, the plea agreement, and the affidavit in
support of the criminal complaint, and such further evidence and
argument as the Court may permit.

Dated: August 21, 2017          Respectfully submitted,

                                SANDRA R. BROWN
                                Acting United States Attorney

                                PATRICK R. FITZGERALD
                                Assistant United States Attorney
                                Chief, National Security Division


                                      /s/
                                ANTHONY J. LEWIS
                                MELISSA MILLS
                                Assistant United States Attorney

                                Attorneys for Plaintiff
                                UNITED STATES OF AMERICA

# TABLE OF CONTENTS

DESCRIPTION                                                                          PAGE

TABLE OF AUTHORITIES ............................................... ii

MEMORANDUM OF POINTS AND AUTHORITIES ............................... 1

I.    INTRODUCTION ................................................ 1

II.   FACTUAL BACKGROUND .......................................... 2

      A.    Procedural History ..................................... 2

      B.    Defendant Supplied a Person He Thought Was a Russian
            Spy with Sensitive Military Satellite Technology ......... 3

      C.    Defendant's Wife and Online Paramour, and His Attempt
            to Acquire Anectine ..................................... 6

III.  GOVERNMENT'S SENTENCING POSITION AND RECOMMENDATION ......... 10

      A.    Sentencing Guidelines Calculation ..................... 10

      B.    Nature and Circumstances of the Offense ................ 13

      C.    History and Characteristics of the Defendant ........... 14

      D.    Seriousness of the Offense, Respect for the Law,
            Adequate Deterrence, and Just Punishment ............... 14

      E.    Kinds of Sentences Available and Policy Considerations .. 15

      F.    Need to Avoid Sentencing Disparities ................... 15

IV.   CONCLUSION ................................................. 15

# TABLE OF AUTHORITIES

DESCRIPTION                                                            PAGE

Cases

United States v. Becerril-Lopez,
  541 F.3d 881 (9th Cir. 2008)........................................ 15


Statutes

18 U.S.C. § 1831 ............................................... 2, 15

18 U.S.C. § 3553(a) ............................................... 2

22 U.S.C. § 2778 ........................................... 2, 11, 15


Rules

U.S.S.G. § 2B1.1(a)(2) ........................................... 11

U.S.S.G. § 2B1.1(b)(1)(I) ........................................ 11

U.S.S.G. § 2B1.1(b)(13)(B) ....................................... 11

U.S.S.G. § 2B1.1(b)(15)(A) ............................... 11, 12, 14

U.S.S.G. § 2M5.2(a)(1) ........................................... 11

U.S.S.G. § 3B1.3 ................................................. 11


Regulations

22 C.F.R. § 127.1(a) ......................................... 2, 11

## MEMORANDUM OF POINTS AND AUTHORITIES

I.   INTRODUCTION

While working as an employee of a cleared defense contractor, defendant met on multiple occasions with a person he thought was an agent of a Russian intelligence service.  At those meetings, defendant handed over thumb drives containing trade secrets and technical data controlled for export from the United States related to military satellites, which files defendant had downloaded from his employer's computer network just before each meeting.  Defendant understood the sensitivity of the data he stole and supplied, explained its significance and how the data could be used to exploit U.S. satellites, and continued meeting knowing that the information would be sent "to Moscow" and that his Russian handler likened his role to the characters in the television show "The Americans."

Defendant's Russian "handler" was in reality an under-cover employee ("UCE") of the Federal Bureau of Investigation ("FBI"). While defendant told the UCE that his motive to sell secrets was to pay for his wife's medical bills, in fact, defendant sent much of the $3,500 cash he received from the UCE to his online paramour. That cash was just a portion of over $20,000 defendant mailed to his paramour, in addition to televisions and other gifts he sent to her; meanwhile, defendant told his wife she needed to cancel her upcoming medical appointments because he did not have the money to pay for them.  Worse still, defendant leveraged his secret relationship with the UCE to barter secrets for Anectine, a muscle relaxant that defendant intended to administer to his wife unwittingly--as the evidence below shows--in order to kill her.

The government agrees with the factual findings and Guidelines calculations in the Pre-Sentence Investigation Report ("PSR") prepared by the U.S. Probation Office ("USPO"), with one exception: the evidence shows that the offense involved the conscious or reckless risk of death or serious bodily injury, which warrants the application of a two-level enhancement.  This one enhancement is the only disputed guidelines factor under the plea agreement.

Defendant betrayed his country, sold out his employer, and prepared to kill his wife.  Regardless of whether that enhancement is applied,  the facts set forth below supporting are, at a minimum, aggravating and should be accounted for under 18 U.S.C. § 3553(a), and thus a sentence of eighty-seven months' imprisonment, three years of supervised release, and a $100 mandatory special assessment is a just punishment for defendant's conviction for committing economic espionage and violating the Arms Export Control Act.

## II.   FACTUAL BACKGROUND

### A.   Procedural History

After a meeting with the UCE, defendant was arrested pursuant to a complaint on July 7, 2016, and was ordered detained.  (CR 1, 7, 9.)  Defendant was indicted on July 19, 2016, for the same two charges contained in the complaint:  Count One charged defendant with attempted economic espionage in violation of 18 U.S.C. § 1831(a)(5), and Count Two charged defendant with attempting to send export-controlled  technical data out of the United States in violation of the Arms Export Control Act ("AECA"), 22 U.S.C. § 2778(b)(2) and (c), and the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. § 127.1(a) and (e).  (CR 13.)  Those charges arose from one of defendant's meetings with the UCE on March

4, 2016, when defendant provided a USB thumb drive containing files defendant had downloaded from his employer's computer network.

Defendant pled guilty to both counts of the indictment pursuant to a plea agreement on May 22, 2017. (CR 34, 36.)

The USPO disclosed the PSR and its recommendation letter (the "USPO Letter") on August 7, 2017. (CR 37, 38.)

### B.   Defendant Supplied a Person He Thought Was a Russian Spy with Sensitive Military Satellite Technology

Defendant's offense conduct is set forth in detail in the affidavit in support of the complaint (CR 1), the plea agreement (CR 34 ¶ 14), and the PSR (¶¶ 15-43, ¶¶ 91-97). Defendant was an engineer at a cleared defense contractor ("Cleared Contractor A"), where he worked on multiple military and U.S. government satellite programs, including the Wideband Global Satellite Communications or "WGS." (PSR ¶¶ 16).

Between February and July 2016, defendant met in person with the UCE six times, first in a public location and each of the following meetings in a hotel room. At all of the hotel meetings, defendant provided a USB thumb drive containing files he had downloaded from Cleared Contractor A's computer network, and the UCE gave defendant first $500 and then $1,000 cash at each of the subsequent meetings (except the last when defendant was arrested). (PSR ¶¶ 28-29, 32, 35, 37, 40.) Defendant understood that the information he provided would be sent "back to Moscow and they will review this," and defendant also understood the security risks in his endeavor. (PSR ¶ 26.)

Defendant entered into this relationship, with a person who he thought was a Russian spy, with eyes wide open. Defendant asked the

3

UCE about his place in Russian intelligence services, asking if the UCE was "in the FSB."[1] (PSR ¶ 27.) The UCE said that he was not, that he was in the SVR, which he likened to the American CIA. (Id.) The UCE said that the best way to explain his position was by reference to the television show "The Americans," which defendant said he had seen. (Id.)

The four trade secrets that are the subject of the charges were downloaded by the defendant on March 2, 2016, among 29 items that defendant downloaded onto a USB thumb drive. (Complaint Aff. ¶ 52.) Defendant provided the USB drive to the UCE when they met in a hotel room on March 4, 2017. (PSR ¶ 32.) Those trade secrets all related to WGS: one related to verifying encryption and decryption functionality; another related to testing the satellites operations; another related to the plan used to develop the firmware that will be installed on WGS satellites; and another related to the plan used to test the configuration of Cleared Contractor A's sensitive anti-jamming technology used on WGS satellites. (PSR ¶¶ 18-21; Plea Agrt. ¶ 14.b.i-iv.) Those files are covered by Category XV(f) of the United States Munitions List, and thus controlled for export by the ITAR, which requires a license before they could be exported to any country or disclosed to foreign persons. (PSR ¶ 23.) The cost of developing those four files, as determined by a subject matter expert who examined the contracts and files, is $3,186,072. (PSR ¶ 44, 58; Plea Agrt. ¶ 14.w, 16.a.)

---

[1] The "FSB," or Federal Security Service of the Russian Federation, is the principle security agency of the Russian government and the main successor agency to the KGB, the Soviet-era intelligence agency.

1   Those four files are a fraction of the total files for WGS and

2   other satellite programs that defendant supplied the UCE.  (E.g.,

3   Complaint Aff. ¶ 44.d ("Copying 46 items (148 MB)"), ¶ 61.d ("Copying

4   8 items (14.5 MB)" and "Copying 19 items (82.9 MB)"), ¶ 73.c

5   ("Copying 15 items (11.4 MB)"); PSR ¶ 34 (defendant provided

6   information related to GPS satellites to the UCE), ¶¶ 32, 35

7   (defendant provided data related to TDRS satellite to the UCE).)  At

8   the second-to-last meeting, defendant said that he had brought all of

9   the schematics for how the satellite was built, explaining that what

10  he provided would allow the UCE's associates to build and test it

11  themselves.  (PSR ¶ 37.)

12  Defendant knew well the sensitive nature of the files that he

13  stole and delivered to the person he thought was a Russian spy.

14  Defendant had access to these sensitive files by virtue of his

15  position at Cleared Contractor A.  (PSR ¶ 65.)  He was trained on the

16  sensitivities regarding export controls, and circumvented the

17  measures that Cleared Contractor A used to maintain the information

18  contained in the files as confidential technical data and trade

19  secrets.  (PSR ¶ 22, 24.)  In describing the materials he gave to the

20  UCE, defendant said they were "considered trade secrets so none of

21  that's gunna be available" on the Internet.  (PSR ¶ 25.)  Showing he

22  knew exactly the type of sensitive technical data he had secreted

23  from his employer and the illegality of doing so, defendant

24  repeatedly described it as material controlled by ITAR.  At one

25  meeting defendant told the UCE that "everything is ITAR.  Do you know

26  ITAR?"  (PSR ¶ 25.)  At the third meeting, defendant confirmed that

27  "everything that we have is going to be governed by ITAR" (PSR ¶ 31),

28  described ITAR more in the fourth meeting (PSR ¶ 34), and in the

fifth meeting explained more research he had done into ITAR (PSR ¶ 36).  After defendant was arrested, in a recorded and <u>Mirandized</u> interview, defendant said he knew what he was doing was "pretty illegal."

Defendant confirmed, for example, that all of the GPS information he provided was current (PSR ¶ 34), provided a handwritten document related to a sensitive component of the WGS system (<u>Id.</u>), and suggested that the information he provided could be used to intercept communications--or even substitute communications (PSR ¶ 37).  Just before he was arrested, defendant offered to continue helping the UCE in new ways:  defendant offered to plug in a portable hard drive in order to copy information from a classified computer system in a facility to which he had just gained access.  He also offered to give a tour of his work facility to the UCE, during which he would allow the UCE to wear glasses that allowed him to take photographs of the facility--which defendant knew was prohibited due to the highly sensitive nature of the work conducted there.  (PSR ¶¶ 38-39.)

### C.  Defendant's Wife and Online Paramour, and His Attempt to Acquire Anectine

At the outset of their relationship, the UCE asked defendant why he sought out Russia and what defendant expected.  Defendant said that his wife's medical care was expensive and that he needed money.  (PSR ¶ 25; Complaint Aff. ¶¶ 42.a, 42.j.)  Defendant later cited his debt and "medical bills" when suggesting that the UCE ask his superiors to assess the value of the information he supplied.  (PSR ¶ 27; Complaint Aff. 45.e ("[M]y wife is going to need medical care for the rest of her life, so that number will grow.").)

1   While purporting to be driven by desperation and a desire to

2   provide for his wife's medical needs, defendant actually diverted

3   most of the $3,500 cash he got from the UCE to his online paramour, a

4   woman he had never met in person and knew as "Chay." (PSR ¶ 42.)

5   The cash that defendant received from the UCE, however, was only a

6   small portion of at least $21,420 in cash that defendant sent by

7   FedEx to Chay between December 2015 and May 2016. (PSR ¶ 43.)  In

8   addition to cash, defendant also sent Chay various consumer goods

9   including televisions, a purse, a fan, a grill, and furniture.

10  (Complaint Aff. ¶ 31.)

11  While diverting over $20,000 in cash to his paramour, whom he

12  had never met, defendant told his wife to cancel all of her upcoming

13  medical appointments for the foreseeable future because they did not

14  have the money to repair the car to bring her there. (Complaint Aff.

15  ¶ 24.)

16  But defendant plotted a darker path.  Defendant began asking the

17  UCE for Anectine.  (PSR ¶¶ 91-93.)  Anectine, also known as

18  succinylcholine chloride, is a muscle relaxant for intravenous

19  administration generally administered in a hospital, doctor's office,

20  or clinic, and it can result in rapid muscle breakdown leading to

21  life-threatening symptoms, including cardiac arrest.  (PSR ¶ 91 &

22  n.1.)  During the fifth meeting on May 12, 2016, defendant said the

23  following to the UCE:

24      Anectine was one of the things they gave her to help her,
        to help her relax her chest to be able to breathe.  Um, so,
25      you know you, how you're supposed to breathe, right?
        You're not supposed to breathe with your chest, you know,
26      you're not supposed to do that.  Breathe with the
        diaphragm.  Like this.  So the problem is, because of the
27      diabetes, she's gained so much weight that when she's
        asleep, her diaphragm can't expand this way, so, so she
28      breathes like this, and her chest gets really tight so,

7

> instead of, she's breathing like, and that was one of the
> first things they saw in the sleep study so they gave her,
> gave a shot of this muscle relaxer and almost instantly,
> she's still breathing in her chest instead of down here,
> but she was able to breathe much, much easier.

(PSR ¶ 93; Exh. A.)  During the last meeting, just before he was arrested, when the UCE brought a substance that he professed was Anectine, defendant said he planned to administer it to his wife. When asked if he had experience with this, defendant said that he had been practicing with insulin.  (Exh. B at 18-19.)  When told that Anectine could be very dangerous, defendant said that any medication can be risky, and reiterated that he wanted it in order to help her sleep.  (Id. at 19-20.)

In fact, his wife had never received Anectine, it had never been administered by the sleep center she visited, and it had never been prescribed by the sleep center.  (PSR ¶ 95; Complaint Aff. ¶ 69.)  In other words, defendant's account of his wife's expectation to be injected with Anectine was fabricated.

In a post-arrest interview, defendant admitted that he had planned to administer the putative Russian intelligence officer's Anectine to his wife, that his wife did not know about Anectine and had never consented to use it, that defendant had researched the drug and was aware that outside of a hospital setting Anectine was most often used as a poison "for killing," and that he had read about one or more instances in which Anectine had been used as a murder weapon. (PSR ¶ 97.)

Specifically, during his post-arrest statement, defendant said that his "intent was that I would give it to my wife to help her breath and help her sleep."  The interviewing FBI agent inquired what would happen if he asked defendant's wife about a prescription for

8

Anectine, and defendant said, "she doesn't have one."  When asked a

similar question about inquiring of defendant's wife as to

conversations they had had about using Anectine to help her,

defendant said "we haven't had one."  The agent then asked defendant

what his wife's reaction would be if she realized what Anectine would

do.  Defendant explained that his wife was not familiar with

Anectine.  Defendant said he intended to use it with his wife, and

reiterated that it was to help her sleep; however, he also admitted

that he had never discussed it with her and that she had never taken

it or ever had a prescription for it.  Defendant said that several

months ago his colleague had showed him a story about a nurse who had

used Anectine to kill children, and that defendant understood that

Internet searching for Anectine brought up results "about killing."

Defendant said he understood that one "had to be very careful with

it," and that when used outside of a hospital setting, Anectine was

most often used "for killing."  When asked what the agent was

supposed to think when evaluating the facts that defendant had just

acknowledged, defendant said:  "You're supposed to think I'm trying

to kill my wife."  Defendant said this would be a reasonable

assumption.  Defendant nonetheless maintained that he was just trying

to help his wife sleep.  Defendant acknowledged that "an overdose

would be lethal," but maintained that he did not intend to administer

a lethal dose to his wife--that it would be "unacceptable."[2]

---

[2] The government may play several minutes of the video of
defendant's post-arrest statement on this topic at the sentencing
hearing.

1     Defendant had viewed multiple web pages relating to Anectine and

2 its generic name, including one that made reference to its use as a

3 poison in connection with a murder.   (PSR ¶ 96; Exh. C.)

4     Thus, the following facts are undisputed:

5     • Defendant intended to administer the Anectine to his wife,

6       and his wife did not know about that plan.

7     • Defendant knew that Anectine was used for killing outside

8       of a hospital setting.

9     • Defendant knew there was a lethal risk of overdosing on

10       Anectine.

11     • Defendant was not aware of what a "safe" dose of Anectine

12       would be -- or even if there could be such a thing outside

13       of a hospital setting.

14     • Defendant lied about having a prescription.

15     • Defendant lied about his wife's alleged prior use of

16       Anectine at a sleep center.

17     • Defendant lied about his wife knowing about it at all.

18     • Defendant conducted online research about Anectine and its

19       use as a poison.

20     • Defendant sought to obtain this lethal drug for his wife,

21       without her knowledge, from a Russian intelligence agent in

22       a transaction that defendant presumed would never see the

23       light of day.

24 **III. GOVERNMENT'S SENTENCING POSITION AND RECOMMENDATION**

25     **A.   Sentencing Guidelines Calculation**

26     As set forth in the plea agreement, the parties agree on a

27 number of sentencing factors, which collectively amount to an

28 offense level of 25.   The parties have left open the enhancement for

1   conscious or reckless risk of death or serious bodily injury, which,
2   if applied--as the government submits it should be--would result in
3   an offense level of 27.

4        Defendant has pled guilty to two counts.  The parties agree
5   that the offenses group under U.S.S.G. § 3D1.2(a) and § 3D1.2(b),
6   and that the count with the higher offense level will be the offense
7   level for the single group.  Plea Agrt. ¶ 18.

8        As to Count One, the parties agree that the base offense level
9   is 6 (U.S.S.G. § 2B1.1(a)(2)), that a four-level enhancement applies
10  for misappropriating a trade secret knowing and intending it would
11  benefit a foreign government, agent, or instrumentality (U.S.S.G. §
12  2B1.1(b)(13)(B)), and that a sixteen-level enhancement applies based
13  on a loss amount of more than $1.5 million and up to $3.5 million
14  (U.S.S.G. § 2B1.1(b)(1)(I)).  Plea Agrt. ¶ 16.a.  That yields an
15  offense level of 26, before the application of an enhancement
16  pursuant to U.S.S.G. § 2B1.1(b)(15)(A) for offense conduct involving
17  the conscious or reckless risk of death or serious bodily injury,
18  discussed below.  (Plea Agrt. ¶ 16.a.i.)

19       As to Count Two, the attempted violation of the Arms Export
20  Control Act, 22 U.S.C. § 2778(b)(2) and (c) and 22 C.F.R. § 127.1(a)
21  and (e), the parties agree that the base offense level is 26
22  (U.S.S.G. § 2M5.2(a)(1)).  Plea Agrt. ¶ 16.b.  With no specific
23  offense characteristics, that yields an offense level of 26 as well.

24       The parties agree that a two-level upward adjustment applies
25  for defendant's abuse of his position of trust pursuant to U.S.S.G.
26  § 3B1.3.  Plea Agrt. ¶ 17.

27       With the government's motion for defendant to receive a
28  reduction in offense level under U.S.S.G. § 3E1.1 (Plea Agrt.

                                    11

¶ 3.c), defendant's offense level will be reduced by three levels.
(Plea Agrt. ¶ 18.)

As noted above, there is one enhancement the parties dispute--
whether defendant's offense involved conscious or reckless risk of
death or serious bodily injury pursuant to U.S.S.G.
§ 2B1.1(b)(15)(A).  Plea Agrt. ¶ 16.a.i.  This enhancement should
apply because defendant sought Anectine from a person he thought was
a Russian intelligence officer, as consideration for secreting
Cleared Contractor A's sensitive military technology, in order to
secretly administer it to his wife.  Although defendant had not gone
so far as to administer the substance he thought was Anectine, he
had schemed to acquire a hospital-grade muscle relaxant that he knew
was used as a murder weapon.  Defendant himself conceded that it
would be reasonable to infer he intended to murder his wife.
Whether or not he did so intend, defendant's offense conduct
involved--at a bare minimum--a reckless risk that his wife would die
or be seriously injured when he injected her with the Anectine.

Defendant did not concede that he intended to use the substance
for anything other than helping her with her sleep, but even briefly
considering that assertion shows it is not credible.  To do so would
mean that defendant sought a prescription drug he could not
otherwise get; that he sought it from a person whose relationship
with defendant was secret and which would not be revealed because of
their shared risk in other illegal conduct; that, even within that
relationship, defendant told his "handler" lies about his wife's
previous use of Anectine and her prescription for it; that defendant
read online how it could be used as a poison; and that, with no
medical basis or experience to conclude that it could be used for

12

breathing or sleep assistance from either the sleep center or his own research--let alone knowledge of the appropriate dosage-- defendant planned to administer a dangerous drug with a lethal risk of killing his wife without telling her.  But, according to defendant, he was planning to do it for her benefit, for the purpose of letting her sleep better.

Even accepting defendant's statements at face value and in the light most favorable to him, defendant indisputably provided to a putative Russian intelligence officer sensitive satellite information as consideration for a highly dangerous controlled drug that he intended to secretly administer to his wife, that he knew could be lethal in the wrong dose, and for which he did not know the correct dosage (Ex. B at 20-21 (defendant inquired if the UCE's associates "happen[ed] to mention a, uh, uh, an appropriate dose," and then claiming that the dose was on the "prescription" (that did not exist)).)  By these actions, at a bare minimum and by well more than a preponderance of the evidence, defendant engaged in conduct that would consciously and recklessly cause a risk of death or serious injury to his wife.  With that enhancement, the total offense level in light of the other enhancements and adjustments above yields a total offense level of 27.  With a Criminal History Category of 0 (PSR ¶ 78), defendant's advisory guidelines range is 70-87 months.

### B.    Nature and Circumstances of the Offense

The nature and circumstances of the offense are detailed at length above, and warrant the recommended sentence.  Defendant's own words reflect his intent to compromise valuable and sensitive military data on behalf of a foreign intelligence service, and he did

13

so for profit while undermining the national security of the United States.  In the same stroke, defendant sought to bargain those secrets not only for cash for his online paramour, but also for a lethal drug that he intended to administer to his wife without her knowledge.  A severely aggravating factor set in an already depraved scheme to supply and guide the Russian government on how to disrupt U.S. military satellites calls for a sentence of seven years and three months.  Regardless of whether the Court applies a two-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(15)(A), this sentence is warranted under the totality of the circumstances and evidence set forth above.

### C.   History and Characteristics of the Defendant

Defendant is an educated engineer, and a long-time employee of a cleared defense contractor.  He used his education and training to seek out the materials that would be most valuable to the Russian government, and then to explain their significance and guide the Russian government on how that information could be used against the United States--betraying the trust that had been placed in him.  Any financial urgency that drove his conduct could have been mitigated by eliminating--or even just reducing--the cash and gifts he sent to his online paramour.

### D.   Seriousness of the Offense, Respect for the Law, Adequate Deterrence, and Just Punishment

A significant term of imprisonment is necessary to promote respect for the law, and to deter both defendant and others.  Similar offenses by trained and well-resourced foreign agents or persons in positions of trust in the U.S. government or cleared contractors can be difficult to detect and fully investigate, and a significant

sentence is both warranted and necessary to effectively dissuade
others.  The recommended sentence is both just and commensurate with
defendant's conduct, and it will deter others who may contemplate
doing the same.

### E.   Kinds of Sentences Available and Policy Considerations

For the two counts of conviction for violating 22 U.S.C. § 2778
and 18 U.S.C. § 1831, defendant may be sentenced to up to thirty-
five years in prison.  A sentence of less than a quarter of that--
eighty-seven months--is warranted here, where defendant has pled
guilty to two offenses, his conduct bears multiple aggravating
factors, and by defendant's own words was designed to undermine the
U.S. military.

### F.   Need to Avoid Sentencing Disparities

A sentence of imprisonment of eighty-seven months is, taking
into account the other factors and considerations set forth herein,
likely to avoid a disparity with other cases nationwide, particularly
where the total offense level is 27 and eighty-seven months'
imprisonment is the high end of the resulting advisory Guidelines
range.  See United States v. Becerril-Lopez, 541 F.3d 881, 895 (9th
Cir. 2008) (observing that sentences within the Guidelines range are
unlikely to create a disparity because "it represents the sentence
that most similarly situated defendants are likely to receive").
Other defendants are unlikely to be similarly situated, having
committed acts that both threaten national security and involve a
plot to poison one's spouse.

### IV.   CONCLUSION

For the foregoing reasons, the government respectfully submits
that an appropriate sentence for defendant is eighty-seven months'

imprisonment, three years of supervised release with the terms
recommended by the USPO, and a $100 mandatory special assessment.

# Exhibit A

| | | |
|---|---|---|
| 1 | UC: | Very good. |
| 2 | | |
| 3 | CB: | Today's the 12th? |
| 4 | | |
| 5 | UC: | Yes, I believe so. Okay. |
| 6 | | |
| 7 | CB: | Oh, and then I'll give you this. |
| 8 | | |
| 9 | UC: | Ah yes. Oh thank you very much. Also I wanted to ask, do you still need this Anectine? I |
| 10 | | wanted to make sure. |
| 11 | | |
| 12 | CB: | Yea. Yes, please. |
| 13 | | |
| 14 | UC: | Okay, I think I told you they said you could most likely two, I know you said originally |
| 15 | | the prescription was for three. |
| 16 | | |
| 17 | CB: | Yes. |
| 18 | | |
| 19 | UC: | They said two. But I told you they say it will take little bit of time because it has to be on |
| 20 | | ice constantly they said, so. |
| 21 | | |
| 22 | CB: | Oh okay. Okay. |
| 23 | | |
| 24 | UC: | Yes. |
| 25 | | |
| 26 | CB: | Okay. |
| 27 | | |
| 28 | UC: | You said your wife did this sleep study, did that help identify problems? |
| 29 | | |
| 30 | CB: | Oh yes, and, and that, that uh, Anectine was one of the things they gave her to help her, to |
| 31 | | help her relax her chest to be able to breathe. Um, so, you know you, how you're |
| 32 | | supposed to breathe right? You're not supposed to breathe with your chest, you know, |
| 33 | | you're not supposed to do that. Breathe with the diaphragm. Like this. So the problem is, |
| 34 | | because of the diabetes, she's gained so much weight that when she's asleep, her |
| 35 | | diaphragm can't expand this way, so, so she breathes like this, and her chest gets really |
| 36 | | tight so, instead of, she's breathing like, and that was one of the first things they saw in |
| 37 | | the sleep study so they gave her, gave a shot of this muscle relaxer and almost instantly, |
| 38 | | she's still breathing in her chest instead of down here, but she was able to breathe much, |
| 39 | | much easier. |
| 40 | | |
| 41 | UC: | She was more comfortable this way? |
| 42 | | |
| 43 | CB: | Yes. |
| 44 | | |

| | | |
|---|---|---|
| 1 | UC: | Did you, so they, this sleep study, I hear many people talk about sleep study but I have |
| 2 | | never seen this, how does this work? |
| 3 | | |
| 4 | CB: | Um, you go to a doctor, like your, your primary doctor and he will refer you to a sleep |
| 5 | | clinic and you'll make an appointment and go there at like 8 o'clock at night and spend, |
| 6 | | spend one or two nights. |
| 7 | | |
| 8 | UC: | Oh so you sleep at this – |
| 9 | | |
| 10 | CB: | Yea. |
| 11 | | |
| 12 | UC: | Oh. |
| 13 | | |
| 14 | CB: | Oh yea. They watch you sleep. |
| 15 | | |
| 16 | UC: | Interesting. As long as it will, will benefit her, it's good. |
| 17 | | |
| 18 | CB: | Yes. |
| 19 | | |
| 20 | UC: | Sounds like breathing will be much better. |
| 21 | | |
| 22 | CB: | It's very important. |
| 23 | | |
| 24 | UC: | Yes it is. I understand. |
| 25 | | |
| 26 | CB: | [Laughter] |
| 27 | | |
| 28 | UC: | I'm trying to think anything else. Ah before I forget, next time I will call, I don't know, |
| 29 | | you will remember maybe yes? May 1st or May 2nd, be available for me to call you and |
| 30 | | set up next meeting. |
| 31 | | |
| 32 | CB: | You mean June 1st? |
| 33 | | |
| 34 | UC: | Yes, June 1st, yes, sorry, sorry. |
| 35 | | |
| 36 | CB: | [Laughter] |
| 37 | | |
| 38 | UC: | I've been traveling to much. June 1st or 2nd. |
| 39 | | |
| 40 | CB: | Uh, yes. |
| 41 | | |
| 42 | UC: | It will maybe be easier to remember June 1st, I will call same time. |
| 43 | | |
| 44 | CB: | Okay. |

# Exhibit B




File Number: ▮▮▮▮▮▮
Disc Number: ▮▮▮

| | | |
|---|---|---|
| 1 | UC: | Okay. Just, because they ask me what, because sometimes they confuse what you already |
| 2 | | provided them to what I have received. So I, I try to make sure – |
| 3 | | |
| 4 | CB: | Okay, and I, I, I try very carefully to make sure I don't duplicate what I give you. |
| 5 | | |
| 6 | UC: | Because I think they said there was one or two that maybe, that's why I was trying to |
| 7 | | figure out. No problem. |
| 8 | | |
| 9 | CB: | Yes. |
| 10 | | |
| 11 | UC: | We have plenty of time. |
| 12 | | |
| 13 | CB: | [Laughter] |
| 14 | | |
| 15 | UC: | Oh, and since you have ice now, I will, I will go get this out of refrigerator for you. |
| 16 | | |
| 17 | CB: | Okay. |
| 18 | | |
| 19 | UC: | Now, because it's very smart that you bring ice. |
| 20 | | |
| 21 | CB: | Uh, like you said, I like to be prepared. |
| 22 | | |
| 23 | UC: | Yes, I know. I always tell them you are very impressive person. So I did not know how |
| 24 | | familiar with this, I know you said that, on the phone, you, you would have to administer |
| 25 | | this? |
| 26 | | |
| 27 | CB: | Uh, yes I will because this is – |
| 28 | | |
| 29 | UC: | So this is, they said this is the true, true name is not the generic brand or not this brand |
| 30 | | name. |
| 31 | | |
| 32 | CB: | Yes. |
| 33 | | |
| 34 | UC: | But this is generic formula and they said this is always what is on bottles in hospital. |
| 35 | | |
| 36 | CB: | Okay. |
| 37 | | |
| 38 | UC: | So as you see, it's very cold. |
| 39 | | |
| 40 | CB: | Yes. |
| 41 | | |
| 42 | UC: | They thought they would be able to give you two of these, but they said for now just one, |
| 43 | | if you need more later. |
| 44 | | |

18

File Number:
Disc Number:

| | | |
|---|---|---|
| 1 | CB: | Okay. |
| 3 | UC: | I didn't know how much you needed. |
| 5 | CB: | Just any right now. |
| 7 | UC: | They said this should last long time and, and for administration, do you have experience |
| 8 | | with this, or –? |
| 10 | CB: | Um, I've been practicing giving her, her insulin. |
| 12 | UC: | Ah, so you can help her with this one, yes? |
| 14 | CB: | Yes. |
| 16 | UC: | So, so you understand the injection. This is normally, I don't know if you know |
| 17 | | background on this, this is normally they said powder. It comes in powder form but they |
| 18 | | wanted to go ahead and mix this for you. |
| 20 | CB: | Oh okay. |
| 22 | UC: | In case you did not know the right elements to mix and how to properly do this. |
| 24 | CB: | Oh, so it comes in powder form and I would have to mix it myself? |
| 26 | UC: | Yes but they went ahead and premixed it for you. |
| 28 | CB: | Okay. |
| 30 | UC: | So that's why it is like this. |
| 32 | CB: | Oh okay. |
| 34 | UC: | I did not know – |
| 36 | CB: | No I didn't. |
| 38 | UC: | How much you know about this or not. And then also, this is just for our awareness, I |
| 39 | | trust you, you trust me, and we've developed a good relationship. |
| 41 | CB: | Yes. |
| 43 | UC: | And, they wanted me to make sure you know this is very, could be dangerous, could be |
| 44 | | risky to use, um, are you aware of this? |

File Number: 
Disc Number:

| | | |
|---|---|---|
| 1 | CB: | No. I mean any medication can be, can be risky. |
| 3 | UC: | They said this is normally not given by a pharmacy, this usually in the hospital, and that is fine, we are here to help and support you, yes? |
| 6 | CB: | Okay. |
| 8 | UC: | Whatever you ask for like this. They just wanted to find out, you know, because we have this relationship, to trust each other, you should be able to confide. |
| 11 | CB: | Okay. |
| 13 | UC: | You know if there's any issues or anything that you would like to talk about. |
| 15 | CB: | Okay, alright um, did they happen to mention a, uh, uh, an appropriate dose? |
| 17 | UC: | They didn't mention dose, because they do not want to, you to think they are questioning you because this is not what is going on. |
| 20 | CB: | Okay. |
| 22 | UC: | They just was curious exactly if, they didn't know, you said this was for breathing, they said this maybe not help for breathing, you know, I looked online and they said this can be used for other things which is fine too. |
| 26 | CB: | Okay. |
| 28 | UC: | No big deal, I just curious if, you know, since we've been talking and you know, share this. We want to make sure of any liabilities we should be aware of because – |
| 31 | CB: | Right. Um – |
| 33 | UC: | I know you said you were having issues with your wife and always nagging you and things, things like that. |
| 36 | CB: | [Laughter] |
| 38 | UC: | You know, I didn't know maybe if this was for that or – |
| 40 | CB: | No [Laughter] |
| 42 | UC: | I would understand this if so. I, I, my wife nags very often as well. |
| 44 | CB: | [Laughter] No, this is just to help her sleep. |



File Number:
Disc Number:

| | | |
|---|---|---|
| 1 | UC: | Oh, okay. I was just curious. So you understand to keep this cold, yes? |
| 3 | CB: | Yes. |
| 5 | UC: | Okay. And the doctors did not tell you the dose that you should provide? |
| 7 8 | CB: | Uh, it's written on the prescription, on the form which is at the pharmacy so I don't. I'll. I'll ask. I'll ask the doctor. It shouldn't be, a very little bit. |
| 10 11 | UC: | They said that, depending on what you plan on doing, this should, could last a while or not. |
| 13 | CB: | [Laughter] |
| 15 | UC: | So, this is up to you. |
| 17 | CB: | Okay. |
| 19 | UC: | So, so what else is going on? You, you're always full of information. |
| 21 22 | CB: | [Laughter] Um, I really don't have anything else going on just taking my wife to the doctor's visits and, and go to work. |
| 24 | UC: | Hmm, and this, you said this is late for you, yes? |
| 26 27 | CB: | Uh, it'll be later in the evening. This would be about my 9 0'clock at night. For a normal person. |
| 29 | UC: | And she will not be angry with you? |
| 31 32 | CB: | Uh, no. Uh, she is under the impression that I am in my boss' office having my midyear review. |
| 34 | UC: | Ah, well it is midyear, yes. |
| 36 | CB: | It is midyear. |
| 38 | UC: | Very creative. |
| 40 | CB: | It's actually not, he is doing them this week. |
| 42 | UC: | Oh. |
| 44 | CB: | [Laughter] |

# Exhibit C



## Succinylcholine, A Perfect Poison, Makes Appearance in the Dubai Killing

succinylcholine molecule

According to Dubai authorities, and as reported by *ABC News*, Hamas operative Mahmoud al-Mabhouh was given a shot of succinylcholine prior to other grossly things done to his body on the fateful (for him) day of January 19, 2010. And since your humble correspondent is an anesthesiologist by day, and by call at night, let me tell you why succinylcholine is such a perfect murder weapon.

The best poisons usually have three things in common: small effective dose, also called Median Lethal Dose (or LD50), ease of administration, and rapid and definitive action. The fourth characteristic, the difficulty in detection by a forensics team is a big premium that most poisons don't posess. Most poisons, that is, except succinylcholine and maybe a few other.

So let's review some science, shall we? Succinylcholine is a muscle relaxant. Anesthesiologists call it "sux". Sux is commonly used before intubations, as it completely relaxes patients. Sux is a rapidly acting depolarizer that can be given intravenously (IV) or intramuscularly (IM). Once administered, succinylcholine circulates in the blood, reaches nicotinic receptors on the surface of muscle cells, and there it imitates the action of acetylcholine, a neurotransmitter that our nerves naturally release to make our muscles move. When succinylcholine is given, seconds later the patient fasciculates, and all muscles in his body become depolarized. In essence, sux makes every muscle twitch to the point that it becomes unresponsive to any subsequent stimulation; you can't breathe, you can't even blink.

Sux is highly effective. In IV form, 100 mg of sux will depolarize every muscle in the body of a 70kg man in about 30 seconds. And the patient will not be able to take another breath for at least 5 minutes. So without assisted ventilation, he is toast. The IM dose of sux is not much different, but takes a little longer to set in.

sux victim



So there you have it: succinylcholine is an easy to inject poison, it is highly effective, and is guaranteed-to-work quick. The fourth characteristic of succinylcholine is good news for assassins: it is almost impossible to detect because its metabolites are all naturally occurring molecules. here's how it works. Most molecules of succinylcholine break down in blood into succinylmonocholine and choline, thanks to a circulating enzyme called pseudocholinesterase. The process is so efficient that only a small fraction of succinylcholine molecules that were given actually reach neuromuscular junctions in the first place. Succinylmonocholine is subsequently hydrolyzed into succinic acid, or succinate, a naturally occurring substance well known to anyone who studied biochemistry. The reason succinate is so famous is because it is an important player in TCA (Krebs) cycle, a series of chemical reactions that powers all living cells that use oxygen.

Coming back to Mahmoud al-Mabhouh, he either had an abnormal genetic variant of pseudocholinesterase, which is not uncommon, so some of the suc was not metabolized, or Dubai authorities had access to a highly sensitive succinylmonocholine assay. Or someone, we think, is just bluffing in the Middle East. No surprises there.

Thanks for reading, and here's a great spy movie, courtesy of Dubai authorities:

